UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

**FILED**

AUG 1 2003

LARRY W. PROPES, CLERK
COLUMBIA, SC

FRIENDS OF THE EARTH, INC., *et al.,*        )
                                             )
                    Plaintiffs,              )
                                             )
            v.                               )
                                             )        Civil No. 3:92-2574-O
GASTON COPPER RECYCLING                      )
CORPORATION,                                 )
                                             )
                    Defendant.               )
_____         )

PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION TO AMEND
FINDINGS OF FACT AND CONCLUSIONS OF LAW
AND TO ALTER OR AMEND JUDGMENT

NATURE OF THE CASE

This is a citizen suit to enforce the Federal Water Pollution Control Act, 33 U.S.C. 1251, *et seq.*

STATEMENT OF FACTS

This Court entered an Order and its Findings of Fact and Conclusions of Law disposing of all remaining issues in the above-captioned case on July 18, 2003. Judgment was entered on July 21, 2003.

Plaintiffs have moved pursuant to Rules 52(b) and 59 of the Federal Rules of Civil Procedure that the Court amend its Findings of Fact and Conclusions of Law with respect to plaintiffs' standing. In the alternative, plaintiffs have moved that the Court allow them to present additional evidence as to standing if the Court is not inclined, on the present record, to conclude that plaintiffs have adequately established their standing.

173

ARGUMENT

I

THE COURT SHOULD AMEND ITS FINDINGS AND CONCLUSIONS
CONCERNING PLAINTIFFS' STANDING

Plaintiffs' counsel learned for the first time on July 29, 2003, when they read an article concerning the Court's decision of July 18, 2003, in *The State* newspaper, that Wilson O. Shealy, a member of Citizens Local Environmental Action Network (CLEAN), died on September 22, 2002.

Mr. Shealy's interests in the discharge of pollutants from the Gaston Copper Recycling Corporation were the basis for the Court of Appeals for the Fourth Circuit to conclude that CLEAN had standing to prosecute this citizen enforcement suit. *Friends of the Earth v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 156-164 (4th Cir. 2000) (*en banc*). The court of appeals further stated (*id.* at 161, n. 1):

> It is clear that CLEAN member Shealy has demonstrated injury in fact. The claims of injury to FOE members Jones and McCollough, however, present closer questions. The district court has not had an opportunity to consider their claims in light of the Supreme Court's standing analysis in [*Friends of the Earth v.*] *Laidlaw* [*Environmental Services (TOC) Inc.*, 528 U.S. 167, 180-186 (2000)], 120 S.Ct. at 704-06. We therefore remand Jones' and McCollough's assertions of standing to the district court for evaluation in light of *Laidlaw*. We leave to the discretion of the district court whether to reopen the record for further testimony on the question of FOE's standing.

Based on the opinion of the court of appeals, and well-established Supreme Court precedent, this Court determined that there was no need for it to address separately whether Friends of the Earth also had standing. Slip op., p. 3 & n. 1. This Court stated: "[T]he Court of Appeals *en banc* held that Shealy and hence CLEAN, have standing to sue." *Id.*, p. 3. This Court further explained (*id.*, p. 3, n. 1):

This Court now concludes that further discussion of the standing of Friends of the Earth to maintain this action is unnecessary. The Supreme Court has held that if one of several plaintiff[s] has standing, the others may remain in the action. *Watt v. Energy Action Educational Foundation*, 454 U.S. 151, 160 (1981); *Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 264, and n. 9 (1977); *Buckley v. Valeo*, 424 U.S. 1, 12 (1976) (*per curiam*).

In light of the death of Mr. Shealy, it has now become necessary for this Court to address the issue of the standing of CLEAN and Friends of the Earth, apart from Mr. Shealy's interest in the waters downstream from Gaston Copper's discharge.

The record contains evidence that Guy Jones, a member of both Friends of the Earth and CLEAN, and William McCollough, a member of Friends of the Earth, who both testified at trial, also have standing to maintain this action. Mr. Jones and Mr. McCollough are users of the downstream waters of the North Fork of the Edisto River and the Edisto River. Both members of the plaintiff organizations have health, recreational, aesthetic, and environmental interests in the downstream waters. Mr. McCollough has gone scuba diving on the Edisto River, downstream from Gaston's facility and intends to do so again in the future and also intends to canoe downstream from defendant's facility. Trial Tr. I, pp. 106-108. Mr. Jones owns a company called River Runner that guides approximately 15 canoe trips a year on the North Fork of the Edisto River and the main stem of the Edisto River downstream from Gaston's facility. Trial Tr. I, pp. 92-95. Therefore, Mr. Jones also has an economic interest in the cleanliness of those waters. On each canoe trip, the guides, including Mr. Jones, enter the river water to swim or wade at least once or twice. *Id.*, p. 96. The North Fork of the Edisto River where Mr. Jones leads canoe trips is approximately 10-15 miles from Gaston's discharge point. Jones Testimony, Trial Tr. I, p. 105. Both Mr. McCollough and Mr. Jones are concerned about the pollution emanating from the Gaston facility. In Mr. Jones' words: "[O]n the Edisto River the heavy

metals that may be present from the Gaston Copper plant pose a very real concern." *Id.*, p. 97;

*see also* McCullough Testimony, Trial Tr. I,  pp. 108, 110.

The record also contains uncontroverted evidence from the South Carolina Department of

Health and Environmental Conservation (DHEC) that the discharge from the Gaston Copper

facility goes at least as far as the Edisto River, 16.5 miles downstream.  Pl. Ex. 510, p. 01 02424,

Response to Public Hearing Comment No. 1.  Based on the reasoning of the Supreme Court in

*Friends of the Earth v. Laidlaw Environmental Services (TOC) Inc.*, 528 U.S. 167 (2000), and of

the court of appeals in this case, plaintiffs have standing to maintain this action, based on the

record evidence.

This Court has concluded that Gaston violated the discharge limitations of its permit 91

times and thus, discharged excess toxic pollutants into those downstream waterways.  Slip Op.,

pp. 24-25.   Those 91 violations included excess discharges of  the toxic chemicals copper (Slip

Op., pp. 24-25, citing Pl. Ex. 175, Nos. 153, 516, 528), cadmium (*ibid.*, citing Pl. Ex. 175, Nos.

479, 515), zinc (*ibid.*, citing Pl. Ex. 175, Nos. 495, 508, 529), and the convention pollutant iron

(*ibid.*, citing Pl. Ex. 175, Nos. 482, 492, 494, 507, 509, 527).  This Court also concluded that

Gaston failed to monitor or report its discharges of pollutants in accordance with its permit

requirements hundreds of times. Slip Op., pp. 28-40.

In *Friends of the Earth v. Laidlaw*, *supra*, the Supreme Court found that the sworn

statements of plaintiffs' members "adequately documented injury in fact."  528 U.S. at 183.

Those statements included the statement of Kenneth Lee Curtis that he would recreate on the

River 3 to 15 miles downstream of the defendant's facility if he were not concerned about the

pollution; the statement of Linda Moore that she lived 20 miles from the defendant's facility and

would use the North Tyger River south of the facility and the land surrounding it for recreational

purposes were she not concerned that the water contained harmful pollutants; and the statement of Norman Sharp that he had canoed approximately 40 miles downstream of the Laidlaw facility and would like to canoe closer to the facility if he were not concerned about the pollution of those waters. The trial testimony of the members of the plaintiff environmental organizations in this case are extremely similar to those the Supreme Court found adequate to establish injury in fact in *Laidlaw* and even closer to Gaston's facility.

Plaintiffs set forth proposed Findings of Fact and Conclusions of Law concerning Mr. Jones' and Mr. McCollough's standing in Plaintiffs' Post-Remand Proposed Findings of Fact and Conclusions of Law, submitted on February 28, 2001. The Findings and Conclusions related to the standing of the plaintiffs, based on the individual standing of Mr. Jones and Mr. McCollough, as slightly modified, are attached hereto in Plaintiffs' Exhibit 1. In light of the death of Wilson Shealy, plaintiffs respectfully request that the Court amend its Findings of Fact and Conclusions of Law to make these additional findings and conclusions concerning the standing of the plaintiff organizations based on the evidence concerning Mr. Jones' and Mr. McCollough's use of the downstream waters.

## II

### IN THE ALTERNATIVE, THE COURT SHOULD REOPEN THE RECORD TO ALLOW PLAINTIFFS TO SUBMIT ADDITIONAL EVIDENCE CONCERNING THEIR STANDING

In the alternative, if the Court is unable to conclude on the existing record that CLEAN and Friends of the Earth have standing to maintain this action on the present record, plaintiffs move this Court pursuant to Rule 59(a) of the Federal Rules of Civil Procedure, to reopen the record in order to allow plaintiffs to present additional evidence as to their standing. Even before the death of Mr. Shealy, the court of appeals specifically granted this Court discretion to do so:

"We leave to the discretion of the district court whether to reopen the record for further testimony on the question of FOE's standing." 204 F.3d at 161, n. 1.

Plaintiffs submit that if the Court has any doubt as to the continued standing of CLEAN and Friends of the Earth after the death of Mr. Shealy, they be permitted to make a further record on the issue of standing.

CONCLUSION

For the foregoing reasons, plaintiffs respectfully request that the Court amend its Findings of Fact and Conclusions of Law to make additional Findings and Conclusions concerning plaintiffs' standing. In the alternative, if the Court has any doubt as to plaintiffs' standing on the existing record, plaintiffs request that the Court exercise its discretion to allow plaintiffs to present additional evidence as to their standing in light of the death of Wilson Shealy.

Respectfully submitted,

BRUCE J. TERRIS
KATHLEEN L. MILLIAN
Terris, Pravlik & Millian, LLP
1121 12th Street, N.W.
Washington, DC 20005
(202) 682-2100


ROBERT GUILD
ID # 2499
314 Pall Mall
Columbia, SC 29201

Counsel for Plaintiffs

August 1, 2003

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| FRIENDS OF THE EARTH, INC., *et al.,* | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | Civil No. 3:92-2574-O |
| GASTON COPPER RECYCLING | ) | |
| CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

CERTIFICATE OF SERVICE

I hereby certify this 1st day of August 2003, that I have caused a true copy of the

foregoing Plaintiffs' Motion to Amend Findings of Fact and Conclusions of Law and to Alter or

Amend Judgment and supporting memorandum to be delivered via first-class mail, postage

prepaid, to the following:

> Harold W. Jacobs
> Nexsen Pruet Jacobs & Pollard
> P.O. Drawer 2426
> Columbia, SC 29202

KATHLEEN L. MILLIAN

Plaintiffs' Exhibit 1

## ADDITIONAL FINDINGS OF FACT
## CONCERNING PLAINTIFFS' STANDING

### THE INTEREST OF PLAINTIFFS CLEAN AND FRIENDS OF THE EARTH
### IN THIS ACTION

1.      Based on the following Findings of Fact 2-17, the Court finds that plaintiffs FOE

and CLEAN and their members have health, economic, recreational, aesthetic and environmental

interests in the Boggy Branch of Bull Swamp Creek and waters into which it flows, including

Bull Swamp Creek, the North Fork of the Edisto River and the Edisto River. The Court also

finds that FOE and CLEAN and their members have an interest in Gaston's compliance with the

monitoring and reporting requirements in its NPDES permit.

2.      Gaston discharges to Lake Watson, also known as Fallow's Pond, which flows to

the Boggy Branch and Bull Swamp Creek. Pl. Ex. 510, pp. 01 02425-01 02426, Nos. 8-9.

Gaston is the only industry that discharges wastewater into Lake Watson. Edmunds Testimony,

Trial Tr. V, p. 59. Since Gaston is allowed to discharge 1,000,000 gallons per day, DHEC has

concluded that, in 14 days, the entire contents of Lake Watson (14,000,000 gallons) could be

replaced. Pl. Ex. 510, p. 01 02426, No. 9.

3.      Guy Jones testified that he is a member of FOE and CLEAN. Jones Testimony,

Trial Tr. I, p. 100. Mr. Jones owns a company called River Runner that guides approximately 15

canoe trips a year on the North Fork of the Edisto River and the main stem of the Edisto River

downstream from Gaston's facility. *Id.*, pp. 92-95. Mr. Jones guides these river trips himself

1

and expects to do so again in the future. *Id.*, pp. 94-95. On each canoe trip, the guides, including

Mr. Jones, enter the river water to swim or wade at least once or twice. *Id.*, p. 96.

4.      The parties stipulated that Gaston discharges "non-contact cooling water and

treated stormwater from the facility into the Boggy Branch of Bull Swamp Creek. * * * Boggy

Branch is a tributary of Bull Swamp Creek which flows into the North Fork of the Edisto River."

Stipulation Nos. 3, 4, Trial Tr. I, p. 122. The North Fork of the Edisto River where Mr. Jones

leads canoe trips is approximately 10-15 miles from Gaston's discharge point. Jones Testimony,

Trial Tr. I, p. 105.

5.      DHEC has concluded that Gaston's discharge goes at least as far as the Edisto

River, 16.5 miles downstream. DHEC responded to a question in writing during the public

comment period on Gaston's 1991 permit as follows (Pl. Ex. 510, p. 01 02424, Response to

Public Hearing Comment No. 1):

> I own property where Bull Swamp Creek goes into the Edisto River, and I'd like
> to know, would the runoff go that far?
>
> Yes, the runoff will go to Boggy Branch to Bull Swamp to the Edisto River. The
> confluence of Bull Swamp and [the] Edisto River is 16.5 miles.

6.      In reviewing this evidence, the court of appeals stated *en banc* (*Friends of the*

*Earth v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 158 (4th Cir. 2000)):

> [T]he clear implication of DHEC's response is that Gaston Copper's discharges
> can impact the receiving waterway for a good distance downstream–well past
> Shealy's property and on down to the Edisto River itself.

7.      Mr. Jones' business is affected by the quality of the water, including the presence

of pollution, in the North Fork of the Edisto River and the Edisto River downstream from

Gaston's facility. Jones Testimony, Trial Tr. I, p. 97. Customers on River Runner's canoe trips

2

frequently swim, wade and fish in the water and picnic along the edges of the river. *Id.*, pp. 96-97. They sometimes take fish that they catch home, where they may eat them. *Id.*, p. 97. River Runners' customers are interested in taking canoe trips in areas in which the quality of the water is high and where they would be comfortable swimming. *Ibid.* The quality of the waters on which River Runners guides canoe trips therefore affects River Runners' ability to attract customers to take such trips. *Id.*, pp. 97-99. Mr. Jones stated his concern as follows (Jones Testimony, Trial Tr. I, p. 97): "[O]n the Edisto River the heavy metals that may be present from the Gaston Copper plant pose a very real concern."

8.    Mr. Jones is interested in knowing how much pollution is in the rivers in and on which he swims and canoes. Jones Testimony, Trial Tr. I, p. 102. Mr. Jones does not have the "scientific capability" or the money to monitor the waters he uses or individual dischargers himself. *Id.*, p. 103. He relies on the monitoring of pollutants done by Gaston under the Clean Water Act to learn about pollution being discharged into the rivers where he swims and canoes. *Ibid.* When Gaston does not monitor and report its discharges correctly, Mr. Jones does not "have a source of information of potential contaminants that might be coming from their facility." *Ibid.*

9.    Mr. Jones testified that he personally, aside from his canoe trip business, has recreational interests in canoeing the waterways receiving Gaston's wastewater discharges. Jones Testimony, Trial Tr. I, p. 100. Mr. Jones lives in Columbia, South Carolina, which the Court takes judicial notice is approximately 20 miles from Gaston, South Carolina, where Gaston's facility is located.

3

10.     William McCullough testified that he is a member of FOE.  McCullough
Testimony, Trial Tr. I, p. 110.  Mr. McCollough lives in Chapin, South Carolina, which the Court
takes judicial notice is approximately 30 miles from Gaston, South Carolina, where Gaston's
facility is located.

11.     Mr. McCollough has gone scuba diving on the Edisto River, downstream from
Gaston's facility and intends to do so again in the future.  McCullough Testimony, Trial Tr. I, pp.
106-107.  Mr. McCullough also intends to go canoeing on the Edisto River downstream from
Gaston's facility.  *Id.*, pp. 107-108.

12.     Mr. McCullough is concerned about the quality of the water in the Edisto River in
which he dives and on which he plans to canoe.  McCullough Testimony, Trial Tr. I,  pp. 108,
110.  He is interested in knowing how much pollution is in the water in which he dives and on
which he canoes.  *Id.*, p. 111.  Mr. McCullough does not have the knowledge, means or access to
monitor discharges of pollution into the rivers he uses.  *Ibid.*  Mr. McCullough relies on reports
from Gaston as to the amount of pollution being discharged.  *Id.*, p. 112.  If Gaston does not
monitor and report its discharges accurately, Mr. McCullough would not know if there were any
contaminants in the water.  *Ibid.*  If Mr. McCullough knew the water downstream from Gaston's
facility were polluted, he would be less likely to go dive in it or canoe on it.  *Id.*, pp. 109-110.
Mr. McCullough testified:  "If I thought the water was polluted, I would be less likely to go
canoeing in that particular spot and I would go to a different spot that I would believe would be
less polluted or not polluted at all."  *Id.*, p. 110.

13.     Mildred Myers, co-chairperson of the Board of Directors of CLEAN, also
testified.  Myers Testimony, Trial Tr. I, p. 87.  CLEAN is a membership corporation.  *Id.*, pp. 88-

4

89. CLEAN's members are individuals and organizations in South Carolina who are interested in the quality of South Carolina's environment. *Id.*, pp. 87, 89. One of the ways in which CLEAN attempts to protect South Carolina's environment is through legal proceedings. *Id.*, p. 87. Citizen suits under the Water Act are important to CLEAN as a means of ensuring compliance with discharge permits and deterring future pollution through the threat of penalties for violations of such permits. *Id.*, p. 88.

14. CLEAN's Constitution and By-Laws state that it is a membership organization. Pl. Ex. 509, p. 2, para. V. CLEAN's corporate purposes are "educating South Carolinians about environmental issues affecting them as citizens and ways to address those issues, conducting and publishing research on environmental issues affecting South Carolinians, and conducting education and training." *Id.*, p. 1, Article IIA.

15. Velma[1] Smith, the Executive Director of FOE, testified that FOE is a membership corporation founded in 1969. Smith Testimony, Trial Tr. I, pp. 56, 82. FOE's members are individuals and groups interested in protecting the quality of the environment. *Id.*, p. 83. One aspect of FOE's work is promoting water quality and enforcing compliance with discharge permits. *Id.*, pp. 75-76. FOE does this in part by bringing citizen suits against violators of the Water Act to force them to comply with their discharge permits and to deter them and others from violating such permits in the future. *Id.*, pp. 57-58.

16. Ms. Smith testified that FOE has by-laws. Smith Testimony, Trial Tr. I, p. 85. *See* Pl. Ex. 508. The By-Laws provide that FOE is a membership organization. Pl. Ex. 508,

---

[1] The trial transcript incorrectly records Ms. Smith's first name as "Velner." Smith Testimony, Trial Tr. I, p. 55.

Article III, p. 4. Among the purposes of the corporation are "to combat and eliminate water pollution * * * and the ill health resulting from water pollution * * * and to promote the wise management of natural resources for the betterment of mankind." *Id.*, p. 1.

17.     Neither FOE nor CLEAN can afford to test permittees' effluent themselves. Smith Testimony, Trial Tr. I, p. 62; Myers Testimony, Trial Tr. I, pp. 90-91. Therefore, FOE and CLEAN identify violators of the Water Act by reviewing records, including DMR's, that are prepared by permittees and that show whether the permittees are complying with their permits. Smith Testimony, Trial Tr. I, pp. 59-61; Myers Testimony, Trial Tr. I, pp. 89-90. If permittees do not monitor their discharge accurately, or if they do not report their monitoring results accurately, it is impossible for FOE or CLEAN to know whether that permittee is complying with its permit. Smith Testimony, Trial Tr. I, pp. 60-62; Myers Testimony, Trial Tr. I, p. 90. Without such information, FOE and CLEAN would be unable to bring citizen suits to achieve their goals of ensuring compliance with the Water Act. *See* Smith Testimony, Trial Tr. I, pp. 59-62; Myers Testimony, Trial Tr. I, pp. 89-90.

## ADDITIONAL CONCLUSIONS OF LAW
## CONCERNING PLAINTIFFS' STANDING

STANDING OF PLAINTIFFS CLEAN AND FRIENDS OF THE EARTH

1.      The Court of Appeals for the Fourth Circuit, sitting *en banc*, found that plaintiff Citizens Local Environmental Action Network (CLEAN) had standing to maintain this action with respect to discharge violations and violations of the monitoring and reporting requirements. *Friends of the Earth v. Gaston Copper Recycling Corp.*, *supra,* 204 F.3d at 151, 163, n. 2.

2.      In determining that CLEAN had standing, the court of appeals relied on the standing of CLEAN's member, Wilson Shealy.  204 F.3d at 152-164.  However, since that determination Mr. Shealy died on September 22, 2002.  It is therefore necessary for this Court to determine whether CLEAN has standing based on one or more other members and/or whether FOE has standing based on one or more members.

3.      The Supreme Court has held that so long as one of several plaintiffs has standing, the others may remain in the action.  *Watt v. Energy Action Educational Foundation*, 454 U.S. 151, 160 (1981); *Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 264, n. 9 (1977); *Buckley v. Valeo*, 424 U.S. 1, 12 (1976)(*per curiam*).  Therefore, it is only necessary for this Court to determine that either CLEAN  or FOE has standing.

4.      However the court of appeals further stated (204 F.3d at 161, n. 1):

It is clear that CLEAN member Shealy has demonstrated injury in fact.  The claims of injury to FOE members Jones and McCollough, however, present closer questions.  The district court has not had an opportunity to consider their claims in light of the Supreme Court's standing analysis in *Laidlaw*, 528 U.S. at 180-185. We therefore remand Jones' and McCollough's assertions of standing to the district court for evaluation in light of *Laidlaw*.  We leave to the discretion of the

7

district court whether to reopen the record for further testimony on the question of FOE's standing.

5.     In light of the court of appeals' instructions on remand, and Mr. Shealy's death, this Court has examined the standing of CLEAN and FOE and, based on the following conclusions, the Court concludes that it has standing to maintain this action.

6.     The Clean Water Act contains an express private right of action. Section 505 of the Act specifically authorizes permit enforcement actions brought by "any person or persons having an interest which is or may be adversely affected" by a discharger's actions in violating its permit. 33 U.S.C. 1365. The Court of Appeals for this Circuit, sitting *en banc* in this case, observed that (204 F.3d at 152):

> Congress has indicated that this provision confers standing to enforce the Clean Water Act to the full extent allowed by the Constitution. [citations omitted]

7.     The court of appeals also set forth *en banc* the standing requirements for organizations under the Clean Water Act (204 F.3d at 155):

> An organization has representational standing when (1) at least one of its members would have standing to sue in his own right; (2) the organization seeks to protect interests germane to the organization's purpose; and (3) neither the claim asserted nor the relief sought requires the participation of individual members in the lawsuit.

8.     In *Friends of the Earth v. Laidlaw Environmental Services (TOC) Inc.*, 528 U.S. 167 (2000), the Supreme Court reiterated the test for individual standing in citizen suits under the Clean Water Act as set forth in *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-561 (1992) stating (528 U.S. at 180):

> [T]o satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an "injury in fact" which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to

the challenged action of the defendant; and (3) it is likely, opposed to merely speculative, that the injury will be redressed by a favorable decision.

9.     The standing of citizen groups, including plaintiffs, to bring citizen suits under the Clean Water Act has been upheld by numerous courts.[2] Based on the following Conclusions of Law 10-30, the Court concludes that plaintiffs have satisfied the requirements for standing on behalf of both themselves and their members.

A.     INJURY

10.     In *Friends of the Earth v. Laidlaw*, *supra*, the Supreme Court found that the sworn statements of plaintiffs' members "adequately documented injury in fact." 528 U.S. at 183. Those statements included the statement of Kenneth Lee Curtis that he would recreate on the River 3 to 15 miles downstream of the Gaston's facility if he were not concerned about the pollution; the statement of Linda Moore that she lived 20 miles from the Gaston's facility and would use the North Tyger River south of the facility and the land surrounding it for recreational purposes were she not concerned that the water contained harmful pollutants; and the statement of Norman Sharp that he had canoed approximately 40 miles downstream of the Laidlaw facility

---

[2]  FOE was a named plaintiff and was found to have standing in each of the following Clean Water Act cases: *Friends of the Earth v. Laidlaw Environmental Services (TOC) Inc.*, 528 U.S., 188; *Public Interest Research Group of New Jersey, Inc. v. Powell Duffryn Terminals Inc.*, 913 F.2d 64, 73 (3d Cir. 1990), certiorari denied, 498 U.S. 1109 (1991); *Public Interest Research Group of New Jersey v. Star Enterprise*, 771 F. Supp. 655, 661-664 (D.N.J. 1991); *Public Interest Research Group of New Jersey, Inc. v. Yates Industries, Inc.*, 757 F. Supp. 438, 442-444 (D.N.J. 1991); *Public Interest Research Group of New Jersey, Inc. v. Rice*, 774 F. Supp. 317, 321-324 (D.N.J. 1991); *Public Interest Research Group of New Jersey, Inc. v. GAF Corp.*, 770 F. Supp. 943, 952-953 (D.N.J. 1991); *Student Public Interest Research Group of New Jersey, Inc. v. Jersey Central Power & Light Co.*, 642 F. Supp. 103, 106-107 (D.N.J. 1986); *Student Public Interest Research Group of New Jersey, Inc. v. Georgia-Pacific Corp.*, 615 F. Supp. 1419, 1424-1425 (D.N.J. 1985); *Student Public Interest Research Group of New Jersey, Inc. v. Tenneco Polymers, Inc.*, 602 F. Supp. 1394, 1397 (D.N.J. 1985); *Student Public Interest Research Group of New Jersey, Inc. v. Monsanto*, 600 F. Supp. 1479, 1484 (D.N.J. 1985).

and would like to canoe closer to the facility if he were not concerned about the pollution of those waters. The trial testimony of the members of the plaintiff environmental organizations in this case are extremely similar to those the Supreme Court found adequate to establish injury in fact in *Laidlaw* and even closer to Gaston's Facility.

11.     Gaston's NPDES permit shows that it discharges wastewater into Boggy Branch of Bull Swamp Creek. Pl. Ex. 2. Bull Swamp Creek flows into the North Fork of the Edisto River and from there into the Edisto River. Stipulation Nos. 3, 4, Trial Tr. I, p. 122; McCullough Testimony, Trial Tr. I, pp. 107-108; Pl. Ex. 510, DHEC Response to Question No. 1, p. 2. The members of plaintiffs CLEAN and FOE have substantial health, economic, recreational, aesthetic, and environmental interests in the North Fork of the Edisto River and the Edisto River downstream of its North Fork.

12.     The health, economic, recreational, aesthetic, and environmental interests of the members of CLEAN and FOE members have been injured by Gaston's illegal discharges of cadmium, copper, iron, lead, pH and zinc. The members, Guy Jones and William McCullough, go swimming or diving in the North Fork of the Edisto River and the Edisto River. *See* Findings of Fact 3, 11. As a result, their health is threatened by the discharge into these waters of toxic substances that can cause death and disease.

13.     The use and enjoyment of Messrs. Jones and McCullough of the waters downstream of Gaston's discharges has been diminished by Gaston's illegal discharges. Mr. Jones is concerned about heavy metals from Gaston Copper that may be present in the Edisto River. Finding of Fact 7. Mr. McCullough is less likely to dive in and canoe on the waters

downstream from Gaston's facility if he believes it to be polluted. *See* Finding of Fact 12. Thus, their recreational, aesthetic, and environmental interests in these waters has been harmed.

14.     In addition, the economic interests of plaintiff's member Guy Jones are affected by Gaston's violations of its discharge limitations. Because Mr. Jones' customers want to take canoe trips in areas where the water quality is good and they feel comfortable swimming, Mr. Jones' ability to attract customers to take canoe trips on rivers downstream from Gaston's facility is affected by pollution in those rivers. *See* Finding of Fact 7.

15.     Moreover, the Court has found that excess amounts of the pollutants that Gaston has discharged in violation of its permit limitations have serious effects on the receiving waterways. The Court has concluded that the discharge limitations in Gaston's permit are water-quality-based and that therefore Gaston's discharge violations cause harm to the waterways in which plaintiffs' members have an interest.

16.     A water-quality-based discharge limitation in a discharge permit is designed to ensure that the water quality standards of the receiving waters are being met. 33 U.S.C. 1311(b)(1)(C). Water-quality standards have been promulgated to ensure that the nation's waters are protected and restored in order to support designated uses and to attain the fishable and swimmable and zero discharge goals of the Act. *See* 33 U.S.C. 1311, 1312, 1313; 40 C.F.R. 122.44(d). Thus, Gaston's violations of the discharge limitations that EPA and DHEC specifically designed to protect the water quality of the receiving waters, including Boggy Branch of Bull Swamp Creek, necessarily harm the Creek.

17.     The court of appeals reached this same legal conclusion *en banc* in this case (204 F.3d at 157):

11

> [M]any of Gaston Copper's discharge limits were established by DHEC in order
> to attain a particular water quality. Because these discharge restrictions are set at
> the level necessary to protect the designated uses of the receiving waterways, their
> violation necessarily means that these uses may be harmed. *See, e.g., Public
> Interest Research Group of New Jersey, Inc. v. Rice,* 774 F. Supp. 317, 328
> (D.N.J. 1991).

*Accord PIRG v. Powell Duffryn Terminals, Inc.*, 720 F. Supp. 1158, 1162 (D.N.J. 1989),

affirmed in part and reversed in part on other grounds, 913 F.2d 64 (3d Cir. 1990), certiorari

denied, 498 U.S. 1109 (1991) ("any violation of * * * water quality based effluent limitations

causes some degree of harm to the water quality" of the receiving body of water).

18.    The court of appeals further noted *en banc* that a DHEC employee who testified at

trial agreed with this analysis as to the significance of violations of water-quality-based effluent

limitations.   204 F.3d at 157; *see also* Slip Op. of July 18, 2003, Findings of Fact and

Conclusions of Law, No. 21, p. 18. Thus, plaintiffs are clearly injured by violations of Gaston's

water-quality-based discharge limitations.

19.    In *Laidlaw,* 528 U.S. at 181, the Supreme Court held that "[t]he relevant showing

for purposes of Article III standing * * * is not injury to the environment but injury to the

plaintiff."

20.    In *Laidlaw*, the Supreme Court considered standing in a similar citizen suit under

the Clean Water Act. The Court held that "environmental plaintiffs adequately allege injury in

fact when they aver that they use the affected area and are persons 'for whom the aesthetic and

recreational values of the area will be lessened' by the challenged activity." 528 U.S. at 183

(citing *Sierra Club v. Morton*, 405 U.S. at 735).

12

21.     The injuries suffered here by members Jones and McCollough to their health, recreational, and environmental interests are similar to those found sufficient to confer injury in fact in *Friends of the Earth v. Laidlaw, supra*.  Messrs. Jones and McCollough live approximately 20 miles and 30 miles, respectively from Gaston's facility and use downstream waters for recreational purposes.  *See* Findings of Fact 3-12.  Both testified that they are concerned about the presence of harmful pollutants in those waterways.  *See* Findings of Fact 7, 12.  Moreover, Mr. Jones has an economic interest in the cleanliness of the North Fork of the Edisto River in that he has a business leading canoeing trips on that waterway.  *See* Findings of Fact 3, 7.  Mr. Jones leads canoe trips to approximately 10-15 miles from the Gaston facility. *See* Finding of Fact 4.

22.     In *Friends of the Earth v. Laidlaw, supra*, the Supreme Court found that sworn statements that members of the plaintiff organization refrained from using a river because of concerns about pollution "adequately documented injury in fact."  528 U.S., at 183.  In that case, the River at issue "looked and smelled polluted."  *Id*. at 704.  Here, the River is not yet in that condition.  However, the court of appeals explained in this case *en banc* that a citizen-plaintiff "need not wait until his lake becomes barren and sterile or assumes an unpleasant color and smell before he can invoke the protections of the Clean Water Act."  204 F.3d at 160.  The evidence is undisputed that Messrs. Jones and McCollough use the waters downstream of Gaston's discharge for recreational purposes and, in Mr. Jones' case for economic purposes, and are concerned about the condition of those waterways.  This is ample to confer injury in fact.

23.     The court of appeals *en banc* cited with favor the Fifth Circuit's decision in *Sierra Club v. Cedar Point Oil Co.*, 73 F.3d 546 (5th Cir. 1996)(204 F.3d at 159-160):

Nor has any circuit required additional scientific proof where there was a direct nexus between the claimant and the area of environmental impairment. In *Cedar Point Oil Co.*, for example, the Fifth Circuit held that citizens' concern about water quality in Galveston Bay sufficed as injury in fact where "[t]wo of the affiants live near Galveston Bay and all of them use the bay for recreational activities." 73 F.3d at 556. It was enough that "the affiants expressed fear that the discharge . . . will impair their enjoyment of these activities because these activities are dependent upon good water quality."

24.    In both *Natural Resources Defense Council v. Watkins,* 954 F.2d 974, 979 (4th Cir. 1992), and *Sierra Club v. Simkins Industries, Inc.*, 847 F.2d 1109, 1112-1113 (4th Cir. 1988), certiorari denied, 491 U.S. 904 (1989), the Court of Appeals for the Fourth Circuit held that affidavits of the plaintiffs' members who engaged in boating, fishing and scuba diving in affected waters were sufficient to confer standing. In *Public Interest Research Group of New Jersey, Inc. v. Powell Duffryn Terminals Inc., supra*, 913 F.2d at 71, the Court of Appeals for the Third Circuit held that injuries to the same kind of "aesthetic and recreational interests" that plaintiffs' members assert here are sufficient to confer standing.

25.    Other courts have repeatedly reached the same conclusion. In *Arkansas Wildlife Federation v. Bekaert Corp.*, 791 F. Supp. 769, 776 (W.D. Ark. 1992), the court stated:

Here the members have alleged use of the area in question and have indicated their concerns over the effect of the pollutants on the recreational and aesthetic values of the area as well as the effect of such pollutants on the fish caught in the river. We believe these allegations are sufficient to establish an individual injury in fact.

In *Natural Resources Defense Council v. Outboard Marine Corp.*, 692 F. Supp. 801, 807-808 (N.D. Ill. 1988), the court stated:

It is enough for [plaintiff] to show its members use the water into which [defendant's] allegedly illegal discharges flow. [Plaintiff's] standing is not undermined because [its] members have not explicitly said they are harmed by [defendant's] permit violations. It is enough that they identify harm to their

14

aesthetic or environmental interests from the overall pollution of the waterways. If [defendant] is proved to be violating the terms of its permit, that alone constitutes injury to those using the affected waters. [citations omitted]

*Accord Atlantic States Legal Foundation, Inc. v. Universal Tool & Stamping Co., Inc.*, 735 F. Supp. 1404, 1411 (N.D. Ind. 1990) (plaintiff had standing because its members used the affected waters, even though plaintiff's members had not "personally suffered distinct and palpable injuries from defendant's allegedly illegal discharges").

26.    In addition to having been injured by Gaston's discharge violations, plaintiffs and their members have been injured by Gaston's monitoring and reporting violations. The Court of Appeals for the Fourth Circuit has specifically held *en banc* in this case that citizens can maintain actions under the Clean Water Act against dischargers who fail to comply with the monitoring and reporting requirements of their permits. 204 F.3d at 163, n. 2. The court of appeals stated (*ibid.*):

Because Shealy used a waterway adversely affected or capable of being adversely affected by Gaston Copper's conduct, Gaston Copper's monitoring and reporting violations also cause him injury in fact. * * * CLEAN thus has standing to pursue its monitoring and reporting claims under a straightforward application of this circuit's precedent in *Sierra Club v. Simkins Industries, Inc.*, 847 F.2d 1109, 1112-13 (4th Cir.1988)(defendant's failure to monitor and report effluent discharges as required by permit causes injury in fact to plaintiff's interests in protecting environmental integrity of and curtailing ongoing unlawful discharges into waterway).

*See also Menzel v. County Utilities Corp.*, 712 F.2d 91, 94 (4th Cir. 1983) (Water Act citizen suit can be maintained based on failure to file accurate DMR's).

27.    In the present case, CLEAN, FOE, and their members have suffered injury as a result of Gaston's violations of the monitoring and reporting requirements of its permit. CLEAN and FOE were directly injured because it could not fully enforce the pollutant discharge

15

limitations in Gaston's permit since, as this Court has already found (Slip Op., pp. 28-40), Gaston has committed hundreds of violations of the monitoring and reporting requirements in its permit. *See* Findings of Fact 8, 12, 17.  As a result of Gaston's violations, plaintiffs also could not adequately research compliance with the Clean Water Act. *See ibid.*

28.    Plaintiffs CLEAN and FOE also have standing to challenge Gaston's monitoring and reporting violations based on the interests of their members.  Mssrs. Jones and McCullough each stated that they need accurate information about the pollution in the Boggy Branch of Bull Swamp Creek, the North Fork of the Edisto River and the Edisto River downstream of its North Fork, in order to decide what use they should make of these waterways.  *See* Findings of Fact 7, 8, 12.  Thus, plaintiffs' members have interests that are harmed by Gaston's failure to provide accurate information about its wastewater discharge.

29.    For the foregoing reasons, the Court concludes that the interests of both the organizations and their members have been injured.

16