UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| FRIENDS OF THE EARTH, INC., *et al.,* ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Civil No. 3:92-2574-O |
| ) | |
| GASTON COPPER RECYCLING ) | |
| CORPORATION, ) | |
| ) | |
| Defendant. ) | |
| ) | |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT THAT THEY HAVE STANDING TO CONTINUE THIS ACTION**

This case is a Clean Water Act citizen suit filed in 1992 by Citizens Local Environmental

Action Network, Inc. (hereafter "CLEAN") and Friends of the Earth (hereafter "FOE") against

Gaston Copper Recycling Corporation (hereafter "Gaston").  The merits of the case have already

been decided.  In 2003, this Court found Gaston liable for over 800 violations of the Clean Water

Act and imposed a civil penalty of $$2,340,000, which has yet to be paid.  Findings of Fact and

Conclusions of Law, Docket No. 166 (July 18, 2003) (hereafter "2003 Findings and

Conclusions"), pp. 53-56; Order, Docket No. 168 (July 18, 2003); Final Judgment, Docket No.

168 (July 21, 2003).

The sole purpose of this remand is to address plaintiffs' standing.  In 2000, the Court of

Appeals for the Fourth Circuit held *en banc* that plaintiffs had standing based on the individual

standing of Wilson Shealy, a member of CLEAN.  *Friends of the Earth, Inc. v. Gaston Copper

Recycling Corp.*, 204 F.3d 149, 151 (4th Cir. 2000) (hereafter "*Gaston I*").  Mr. Shealy died on

September 22, 2002, approximately10 years after the case began.  Plaintiffs' Motion to Amend

1

Findings of Fact and Conclusions of Law and to Alter or Amend Judgment, Docket No. 172 (Aug. 1, 2003), p. 1. The sole issue now before the Court is whether plaintiffs continue to have standing after Mr. Shealy's death.

On September 16, 2005, this Court held that plaintiffs continued to have standing through the standing of two of their members, Guy Jones and William McCullough.[1] Order, Docket No. 207 (Sept. 16, 2005), pp. 6-7. On appeal, on February 7, 2008, the Court of Appeals for the Fourth Circuit recognized that Gaston's discharge flowed from Boggy Branch to Bull Swamp Creek to its confluence with the Edisto River and that plaintiffs' members engaged in activities on the Edisto River. *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, No. 06-1714, 2008 WL 344689, at *6-8 (Feb. 7, 2008) (attached hereto as Exhibit 12) (hereafter "*Gaston II*"). There was only one issue the court of appeals found to be still in need of resolution – whether any of plaintiffs' members used an area of the Edisto River impacted by Gaston's pollution. *Id.*, p. *8. The court therefore ordered a "limited remand" to this Court so that it could determine whether plaintiffs' members "used the waters at the confluence of Bull Swamp Creek and the Edisto's North Fork" or "how much farther beyond the confluence that the runoff proceeded and where, in relation to this point, the waters that [plaintiffs' members] used and planned to use were." *Ibid*.

Plaintiffs now move for summary judgment because there can be no dispute that at least one of plaintiffs' members uses the area where Gaston's discharge flows. First, Guy Jones, a member of both FOE and CLEAN, has submitted affidavits showing he uses the area at the

---

[1] Plaintiffs are no longer relying on William McCullough's use of the Edisto River to support standing.

confluence of Bull Swamp Creek and the North Fork of the Edisto River, which is precisely the area that the Fourth Circuit recognized the pollution reached. Thus, there can be no doubt that Mr. Jones has the requisite connection to the waters affected by Gaston's discharge to establish the standing of both plaintiff organizations.

Second, even though it is clear that plaintiffs have standing based on Mr. Jones' use of the area at the confluence of Bull Swamp Creek and the Edisto River, plaintiffs also show that Gaston's discharge travels much farther downstream in the Edisto River and that plaintiffs' members, Guy Jones and William Anderson, a member of FOE, use the downstream areas affected. Plaintiffs' expert, Dr. Bruce Bell, demonstrates in his affidavit that the metals discharged by Gaston dissolve into the water and travel at least 105 miles downstream of the confluence. Mr. Jones and Dr. Anderson use the areas of the Edisto River within this distance.

Thus, it is clear that plaintiffs have satisfied the Fourth Circuit's test for establishing standing because their members use the area which Gaston's pollution reaches. Accordingly, plaintiffs' summary judgment motion should be granted.

## STATEMENT OF FACTS

### A. Procedural History

FOE and CLEAN filed this Clean Water Act citizen suit in 1992. In 2003, this Court issued its judgment on the merits of case, finding Gaston liable for over 800 violations of the Clean Water Act. 2003 Findings and Conclusions, pp. 53-56. These violations included violations of the discharge limits in Gaston's permit for cadmium, copper, iron, oil and grease, pH, and zinc, and reporting and monitoring violations with respect to BOD, cadmium, copper,

lead, iron, mercury, nickel, oil and grease, PCBs, TSS, and zinc. *Id.*, pp. 24-40; Plaintiffs' Trial Ex. 175 (Chronological List of Effluent Violations). This Court imposed a civil penalty of $2,340,000. 2003 Findings and Conclusions, p. 56; Order, Docket No. 168 (July 18, 2003); Final Judgment, Docket No. 168 (July 21, 2003).

In 2000, the Court of Appeals for the Fourth Circuit ruled *en banc* that plaintiffs had standing based on the individual standing of CLEAN member Wilson Shealy. *Gaston I*, 204 F.3d at 151. Mr. Shealy died on September 22, 2002, prior to this Court's judgment on the merits of the case in 2003. Plaintiffs' Motion to Amend Findings of Fact and Conclusions of Law and to Alter or Amend Judgment, Docket No. 172 (Aug. 1, 2003), p. 1. On September 16, 2005, this Court held that plaintiffs continued to have standing based on the individual standing of Mr. Jones and Mr. McCullough, a member of FOE, both of whom engaged in activities on the Edisto River. Order, Docket No. 207 (Sept. 16, 2005), pp. 6-7.

On appeal, in 2008, the Court of Appeals for the Fourth Circuit recognized, based on an official communication from the South Carolina Department of Health and Environmental Control ("DHEC"), that the runoff from Gaston's facility reached at least the confluence of Bull Swamp Creek and the Edisto River. *Gaston II*, 2008 WL 344689, at *7-8. It further recognized that two of plaintiffs' members, Mr. Jones and Mr. McCullough, engaged in activities on the Edisto River. *Id.*, p. *6. The court found that the sole remaining issue was whether one of plaintiffs' members used a part of the Edisto River which the pollutants from Gaston's facility reached. *Id.*, p. *8. The court explained (*ibid.*):

> [W]e cannot determine whether Jones or McCullough had the requisite connection to waters in the affected area without knowing either that they used the waters at the confluence of Bull Swamp Creek and the Edisto's North Fork or knowing how much

farther beyond the confluence that the runoff proceeded and where, in relation to this point, the waters that Jones and McCullough used and planned to use were.

The Fourth Circuit "therefore order[ed] a limited remand so that the district court may resolve these factual issues." *Ibid*. This case is now before this Court on that remand.

## B. Flow of Gaston's Discharge

Gaston discharges waste water from its facility into the Boggy Branch of Bull Swamp Creek. 2003 Findings and Conclusions, p. 8; *see Gaston II*, 2008 WL 344689, at *1. Boggy Branch is a tributary of Bull Swamp Creek, which, in turn, flows into the North Fork of the Edisto River. *Id.*, p. *1.

An official communication from DHEC confirms that Gaston's discharge reaches at least the confluence of Bull Swamp Creek and the North Fork of the Edisto River. An individual who owned property "at the location where Bull Swamp Creek flows into the Edisto River" had asked DHEC whether the runoff from Gaston's facility would reach his property. *Gaston II*, 2008 WL 344689, at *7. DHEC responded that the runoff would "'go to Boggy Branch to Bull Swamp to the Edisto River'" (citation omitted). *Ibid*. As the Court of Appeals for the Fourth Circuit stated in 2000, "the clear implication of DHEC's response is that Gaston Copper's discharges can impact the receiving waterway for a good distance downstream – * * * on down to the Edisto River itself." *Gaston I*, 204 F.3d at 158. Thus, the runoff reaches "at least as far as the Edisto." *Ibid*.

In fact, metals discharged by Gaston will travel a significant distance downstream of the confluence of Bull Swamp Creek and the Edisto River. Plaintiffs' expert, Dr. Bruce Bell, shows that the characteristics of the water in the Edisto River are conducive to the metals remaining

dissolved in the water for at least 105 miles downstream of the confluence. Declaration of Bruce A. Bell, Ph.D, P.E., BCEE (attached hereto as Exhibit 1) (hereafter "Bell Decl."), paras. 16-27. Therefore, nearly all of the metals that reach the confluence will travel in dissolved form for at least 105 miles downstream of the confluence. *Id*., paras. 5, 23, 27. Indeed, data from U.S. Environmental Protection Agency ("EPA") monitoring stations on the Edisto River show that the metals discharged by Gaston are actually present in the river at levels that violate water quality standards. *Id*., paras. 28-30.

**C. Plaintiffs' Members Use Areas Affected by Gaston's Discharge**

### 1. Guy Jones

Guy Jones is a member of FOE and CLEAN. Jones Trial Testimony, Trial Tr., vol. I, p. 100 (attached hereto as Exhibit 10) (hereafter "Jones Trial Testimony"); *Gaston II*, 2008 WL 344689, at *6; Affidavit of Guy Jones, May 29, 2008 (attached hereto as Exhibit 2) (hereafter "2008 Jones Aff."), para. 1. He is the president and majority owner of River Runner Outdoor Center (hereafter "River Runner"), a business that provides guided canoe and kayak trips for the general public. Jones Trial Testimony, vol. I, p. 92; *Gaston II*, 2008 WL 344689, at *6; 2008 Jones Aff., para. 3. Mr. Jones personally organizes and guides many of these trips. Jones Trial Testimony, vol. 1, p. 93; *Gaston II*, 2008 WL 344689, at *6; 2008 Jones Aff., para. 3. On these trips**,** guides and clients typically enter the water. Jones Trial Testimony, vol. I, pp. 96-97; *Gaston II*, 2008 WL 344689, at *6; 2008 Jones Aff., para. 13.

Mr. Jones has canoed at the confluence of Bull Swamp Creek and the North Fork of the Edisto River. Affidavit of Guy Jones, September 30, 2003 (Exhibit 603 to Plaintiffs' Reply Brief in Support of Their Motion to Amend Findings of Fact and Conclusions of Law and to Alter or

Amend the Judgment with Regard to Their Standing, Docket No. 191 (Oct. 7, 2003)) (attached hereto as Exhibit 11) (hereafter "2003 Jones Aff."), para. 3; 2008 Jones Aff., para. 4. One of River Runner's trip routes includes this confluence. *Id.*, para. 5. This route starts at Slab Landing Road, which is slightly upstream of the confluence, and ends at Shillings Bridge Road. *Id.*, para. 6. Thus, the route takes guides and customers exactly to the point of the confluence and then through the waters immediately downstream of the confluence on the North Fork of the Edisto. *Ibid.* Mr. Jones has guided trips on this route approximately six times. *Ibid.* He also has canoed to the confluence with Brent Blackwelder, the president of plaintiff FOE. *Id.*, para. 7.

Mr. Jones also has canoed downstream of the confluence in other areas of the Edisto River impacted by the pollution. Jones Trial Testimony, vol. I, pp. 93-95; *Gaston II*, 2008 WL 344689, at *6; 2008 Jones Aff., paras. 3, 5. He has guided trips for River Runner on the Edisto River from Shillings Bridge Road to the Edisto Memorial Gardens in Orangeburg, from Rowesville to Branchville, and from Green Pond Church to Colleton State Park. Jones Trial Testimony, vol. I, pp. 93-95; *Id.*, paras. 10-12. All of these routes are within the area downstream of the confluence that Gaston's pollution reaches. Bell Decl., para. 31. Mr. Jones also has canoed within these areas for his personal enjoyment. Jones Trial Testimony, vol. I, p. 100; 2008 Jones Aff., paras. 5, 10.

Mr. Jones is concerned about the water quality of the Edisto River in all of these areas and, in particular, the pollution from Gaston's facility. Jones Trial Testimony, vol. I, pp. 97-100; *Gaston II*, 2008 WL 344689, at *6. River Runner can more easily market trips to the general public when the areas to which they lead trips are not affected by pollution. Conversely, pollution makes it more difficult to obtain customers for River Runner's trips. Jones Trial

Testimony, vol. I, pp. 97-99; *Gaston II*, 2008 WL 344689, at *6; 2008 Jones Aff., para. 13.  It is therefore important to him that the water quality in those areas of the Edisto River be high and that customers have no reason to believe that the their health will be threatened by pollution in the water.  *Ibid*.  He also is concerned about the water quality in the Edisto River because of the personal trips he takes on the river.  Jones Trial Testimony, vol. I, p. 100; 2008 Jones Aff., para. 13.

### 2. William Anderson

William Anderson has been a FOE member since 1999.  Affidavit of William Anderson para. 1 (attached hereto as Exhibit 3) (hereafter "Anderson Aff."), para. 1.  He is a professor emeritus of biology at the College of Charleston.  *Id*., para. 2.

Dr. Anderson has a long-standing interest in the Edisto River.  For over 50 years, he has been making periodic visits to the Edisto River, including to a number of locations downstream of the confluence with Bull Swamp Creek.  Anderson Aff., para. 3; Bell Decl., para. 32.  He has used the river for recreation, as well as for educational and research purposes.  Anderson Aff., paras. 4-6.  The locations Dr. Anderson has visited on the Edisto include Orangeburg, the McAlhany Nature Preserve near St. George, an area near Canadys, and Givhans Ferry State Park. *Ibid*.  All of these locations are within the area that is affected by Gaston's pollution.  Bell Decl., para. 32.

Dr. Anderson would like to return to the places he has visited on the Edisto River in the future and also to float the entire length of the river.  Anderson Aff., para. 7.  However, he is concerned about the quality of the water in the river and is far less likely to return to areas that may be polluted.  *Id*., para. 8.

# ARGUMENT

## I

### STANDARD OF REVIEW

Summary judgment should be granted where "there is no genuine issue as to any material fact and * * * the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

After the moving party has properly made and supported a motion for summary judgment, the court should grant summary judgment unless the opposing party sets out specific facts showing a genuine issue for trial. Fed. R. Civ. P. 56(e)(2). The opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). *See also Bauman v. Mila National Health Plan*, 342 F. Supp. 2d 456, 463 (D.S.C. 2004); *Lasher v. Day & Zimmerman Interational, Inc.*, 516 F. Supp. 2d 565, 576 (D.S.C. 2007) ("[C]onclusory allegations or denials, without more, are insufficient to preclude the granting of the summary judgment motion" (citation omitted)).

## II

### THE SOLE ISSUE ON REMAND IS WHETHER ANY OF PLAINTIFFS' MEMBERS USES A PART OF THE EDISTO RIVER WHICH GASTON'S POLLUTION REACHES

This case is on a "limited remand" from the Fourth Circuit for determination of a single factual issue concerning plaintiffs' standing. *Gaston II*, 2008 WL 344689, at *8. The only issue

on remand is whether one or more of plaintiffs' members uses a part of the Edisto River to which discharge from Gaston's facility flows. *Ibid.*

In its 2008 opinion, the Court of Appeals for the Fourth Circuit considered Gaston's appeal of this Court's decision that plaintiffs continued to have standing after Mr. Shealy's death. The court recognized that "damage to an individual's 'aesthetic or recreational interests' may be sufficient" to confer standing (citation omitted). *Gaston II*, 2008 WL 344689, at *6. Further, it rejected Gaston's argument that plaintiffs' members "*concern* for the water they use is not a sufficiently concrete injury to establish standing in the absence of evidence that the water quality was actually affected" (emphasis in original). *Id*., p. *7. The court explained: "A plaintiff is not required to present 'additional scientific proof of actual harm to the environment where there is a direct nexus between the claimant and the area of environmental impairment'" (citation and alteration omitted). *Ibid. See also Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 183 (2000) ("[E]nvironmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons for whom 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." (citation omitted)).

The Fourth Circuit recognized its holding in its first decision in this case that the runoff from Gaston's facility reached at least the confluence of Bull Swamp Creek and the North Fork of the Edisto River. *Gaston II*, 2008 WL 344689, at *7. In so holding, the court had relied on "an official written response" from the South Carolina Department of Health and Environmental Control ("DHEC") to an individual who owned property "at the location where Bull Swamp Creek flows into the Edisto River." *Ibid. See also Gaston I*, 204 F.3d at 158. The owner asked

whether the pollution from Gaston's facility would reach his property, and DHEC responded that the pollution would "'go to Boggy Branch to Bull Swamp to the Edisto River'" (citation omitted). *Gaston II*, 2008 WL 344689, at *7. As the Fourth Circuit stated in 2000, "the clear implication of DHEC's response is that Gaston Copper's discharges can impact the receiving waterway for a good distance downstream – * * * on down to the Edisto River itself." *Gaston I*, 204 F.3d at 158. Thus, the runoff reaches "at least as far as the Edisto." *Ibid*.

In its 2008 decision, the Fourth Circuit also clarified an essential point about its finding that the pollution reaches the confluence of Bull Swamp Creek and the Edsto River. The court rejected Gaston's argument that the pollution reached no farther than that location. *Gaston II*, 2008 WL 344689, at *8. As the court explained, DHEC did not make any finding as to the farthest point Gaston's pollution reached (*ibid.*):

> The DHEC response * * * did not purport to identify the *farthest* point downstream to which the runoff proceeded. Rather, it addressed only whether the runoff proceeded *as far as* the confluence of Bull Swamp Creek and the North Fork of the Edisto River. DHEC acknowledged that it did proceed that far, and DHEC had no reason to discuss to what extent the runoff proceeded further. (emphases in original)

Thus, the Fourth Circuit explicitly recognized the possibility that the pollution flowed farther downstream than the point of the confluence of Bull Swamp Creek and the Edisto. Indeed, it would have been an unlikely coincidence if the person to whom the DHEC response was addressed had just happened to own property precisely at the point where the pollution ended.

Having held that Gaston's pollution reached the Edisto River, as well as possibly farther downstream, the Fourth Circuit ruled that a determination on only one remaining question was necessary to conclude that plaintiffs continued to have standing after the death of Mr. Shealy. Even though there was no dispute that plaintiffs' members engaged in activities on the Edisto

River, the court stated it could not determine whether one of plaintiffs' members used the river in an area affected by Gaston's pollution. *Gaston II*, 2008 WL 344689, at \*8. The court explained (*ibid*.):

> [W]e cannot determine whether Jones or McCullough had the requisite connection to waters in the affected area without knowing either that they used the waters at the confluence of Bull Swamp Creek and the Edisto's North Fork or knowing how much farther beyond the confluence that the runoff proceeded and where, in relation to this point, the waters that Jones and McCullough used and planned to use were. We therefore order a limited remand so that the district court may resolve these factual issues.

Thus, the Fourth Circuit remanded the case to this Court for consideration of whether any of plaintiffs' member have the "requisite connection" to the affected waters and identified two ways in which such a connection might be shown. First, plaintiffs may demonstrate standing by showing that one of their members "used the waters at the confluence of Bull Swamp Creek and the Edisto's North Fork," a location the Fourth Circuit has already recognized the pollution reaches. *Gaston II*, 2008 WL 344689, at \*8. Alternatively, plaintiffs may demonstrate standing by showing that the pollution from Gaston's facility traveled "farther beyond the confluence" of Bull Swamp Creek and the Edisto River and that one of their members uses an area downstream of the confluence where the pollution reaches. *Ibid*.

To establish their standing, plaintiffs need only show that at least one member of either CLEAN or FOE satisfies one of the Fourth Circuit's two tests. As explained by the Fourth Circuit in this case (*Gaston I*, 204 F.3d at 155):

> An organization has representational standing when (1) at least one of its members would have standing to sue in his own right; (2) the organization seeks to protect interests germane to the organization's purpose; and (3) neither the claim asserted nor the relief sought requires the participation of individual members in the lawsuit.

The Fourth Circuit has found there is no dispute as to the latter two elements. *Gaston II*, 2008

WL 344689, at *5.  Plaintiffs may meet the first requirement by showing that "at least one of its members" has the requisite connection to the affected waters under the Fourth Circuit's test.

In sum, the only material facts on this remand are the areas of the Edisto River impacted by pollutants from Gaston's facility and the locations of the river that plaintiffs' members use and intend to use.  If plaintiffs show that at least one of their members uses or plans to use an area where the pollution flows, whether at the confluence of Bull Swamp Creek and the Edisto River or farther downstream, they will have satisfied the Fourth Circuit's requirements to demonstrate their standing.  As shown below, summary judgment should be granted because there is no genuine issue as to the facts relevant to this determination.

### III

### PLAINTIFFS HAVE STANDING BASED ON GUY JONES' USE OF THE WATERS AT THE CONFLUENCE OF BULL SWAMP CREEK AND THE EDISTO RIVER

As discussed above, the Court of Appeals for the Fourth Circuit recognized that the pollution discharged from Gaston's facility reaches at least the confluence of Bull Swamp Creek and the North Fork of Edisto River.  Therefore, under the Fourth Circuit's decision, plaintiffs may demonstrate their standing simply by showing that one of their members uses the area where Bull Swamp Creek flows into the Edisto River.  This showing is easily made because Guy Jones, a member of CLEAN and FOE, has used this area and continues to have an interest in this area.

Mr. Jones is the president and majority owner of River Runner, a business that provides canoe and kayak trips for the general public, including trips on the Edisto River.  Jones Trial Testimony, vol. I, pp. 92-93; 2008 Jones Aff., paras. 1, 5.  Mr. Jones leads many of these trips himself.  Jones Trial Testimony, vol. I, p. 93; 2008 Jones Aff., para. 3.  The Fourth Circuit

recognized Mr. Jones' activities on the Edisto River and his concerns about the quality of the water in the river, but the court believed that it was unclear whether he used a part of the river which Gaston's discharge reached. *See Gaston II*, 2008 WL 344689, at *6-8.

In fact, Mr. Jones has canoed at the confluence of Bull Swamp Creek and the Edisto River. This is demonstrated in two affidavits by Mr. Jones. One of these was submitted to the district court in 2003 (2003 Jones Aff.), but was not considered by the Fourth Circuit.[2] In that affidavit, Mr. Jones stated that "[s]ince the trial in this case, I have canoed at the confluence of Bull Swamp Creek and the North Fork of the Edisto River." 2005 Jones Aff., para. 3. Based on this affidavit alone, it is clear that Mr. Jones has used exactly the area that the Fourth Circuit has recognized is affected by Gaston's pollution.

On this remand, Mr. Jones has submitted another affidavit that provides further information about his trips to the confluence of Bull Swamp Creek and the Edisto River. In this affidavit, Mr. Jones states: "I have canoed in the area at the confluence of Bull Swamp Creek and the North Fork of the Edisto River multiple times * * *." 2008 Jones Aff., para. 4. As Mr. Jones explains, one of the routes taken by River Runner "includes the confluence of Bull Swamp Creek

---

[2]Plaintiffs mistakenly stated in their brief to the Fourth Circuit that this Court had denied its motion to reopen the record to consider this affidavit. *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, No. 06-1714, Appellee's Brief, May 2, 2007, p. 39, n.10. Presumably in reliance on this statement, the Fourth Circuit stated that "[a]pparently in light of that ruling [on standing], the district court denied Plaintiffs' request to supplement the record." *Gaston II*, 2008 WL 344689, at *4. In fact, there was no such denial – this Court simply held that plaintiffs continued to have standing based on evidence previously submitted (Order, Docket No. 207 (Sept. 16, 2005), pp. 6-7) and found that their request to submit the new evidence and accordingly amend the findings of fact was mooted by this holding (*id.*, p. 7). Plaintiffs filed a Petition for Rehearing to request that the Fourth Circuit consider this evidence, but the petition was denied without explanation. *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, No. 06-1714, March 12, 2008.

and the North Fork of the Edisto River." *Id*., para. 5. This route begins at Slab Landing Road, which is just upstream of the confluence, and ends downstream at Shillings Bridge Road. *Id.*, para. 6. Thus, after starting at Slab Landing Road, "[this] route takes guides and customers exactly to the point of the confluence and then through the waters immediately downstream of the confluence on the North Fork of the Edisto." *Ibid*. Mr. Jones estimates that he has taken approximately six trips on this route. *Ibid*. In addition to the trips he has taken to the confluence in his capacity as a guide for River Runner, Mr. Jones also made a canoe trip to the confluence with Brent Blackwelder, the president of FOE, and Robert Guild, counsel to FOE and CLEAN in this case. *Id*., para. 7.

Mr. Jones believes that the area near the confluence is "strikingly beautiful" and he "would like to return to this area in the future." 2008 Jones Aff., para. 9. However, he explains that "[i]n recent years, River Runner has decreased the number of trips it takes near the confluence of Bull Swamp Creek and the Edisto River, in part because of concern that the runoff from the Gaston Copper facility is polluting this area." *Id*., para. 8. He also states that he would be more likely to return to this area himself if he "did not think that the area was polluted." *Id*., para. 9.

Accordingly, the Fourth Circuit's test for establishing plaintiffs' standing is satisfied. Even without considering whether Gaston's pollution travels downstream of the confluence of Bull Swamp Creek and the Edisto River, plaintiffs have standing under the Fourth Circuit's decision because Mr. Jones has "used the waters at the confluence of Bull Swamp Creek and the Edisto's North Fork." *Gaston II*, 2008 WL 344689, at *8.



**Waters near the confluence of Bull Swamp Creek and the Edisto River (see Exhibits 4, 8)**

**IV**

**. PLAINTIFFS HAVE STANDING BASED ON THEIR MEMBERS' USE OF DOWNSTREAM AREAS IMPACTED BY GASTON'S POLLUTION**

While the Fourth Circuit found that Gaston's pollution reaches the confluence of Bull Swamp Creek and the Edisto River, that is not the farthest distance the pollution travels. The court of appeals itself recognized that the pollution may flow farther than the confluence (*Gaston II*, 2008 WL 344689, at *8) and plaintiffs' expert has submitted an affidavit demonstrating that discharge from Gaston's facility travels at least 105 miles on the Edisto River downstream of its

confluence with Bull Swamp Creek (Bell Decl., para. 5).  At least two of plaintiffs' members, Guy Jones and William Anderson, use parts of the Edisto River within this distance.  2008 Jones Aff., paras. 6, 10-12; Anderson Aff., paras. 4-6; Bell Decl., paras. 31-32.  Thus, even though plaintiffs have standing based on Mr. Jones' use of the area at the confluence of Bull Swamp Creek and the Edisto River alone, their standing is also established through their members' use of the Edisto River downstream of the confluence.

A.    **Gaston's Discharge Flows in the Edisto River at Least 105 Miles Downstream of Its Confluence with Bull Swamp Creek**

Plaintiffs' expert, Dr. Bruce Bell, demonstrates that discharge from Gaston's facility flows downstream on the Edisto River to a point at least 105 miles from its confluence with Bull Swamp Creek.  Dr. Bell is president of Carpenter Environmental Associates, Inc., an environmental science and engineering firm.  Bell Decl., para. 1.  He holds a doctorate in environmental engineering and has over 38 years of experience in that field.  *Ibid*.  He has previously testified as an expert in this case as well as in numerous other federal court cases.  *Id*., para. 3.

Dr. Bell analyzed the question of whether the pollutants discharged by Gaston travel in the Edisto River downstream of its confluence with Bull Swamp Creek and, if so, how far they travel.  Bell Decl., para. 4.  In analyzing this question, he focused on the metals related to Gaston's Clean Water Act violations, including cadmium, copper, iron, lead, mercury, nickel, and zinc, because data were available to assess how far those pollutants travel.  *Id*., para. 8.  He concluded that the metals travel downstream in the Edisto River because they remain in dissolved form and travel with the water in the river.  *Id*., paras. 5, 23, 27.  The water chemistry

in the Edisto River is conducive to the metals traveling in their dissolved form for at least 105 miles downstream of the Edisto River's confluence with Bull Swamp Creek and likely somewhat farther. *Ibid*.

As Dr. Bell explains, "[m]etals discharged into the environment are persistent." Bell Decl., para. 9. While the form of the metals may change, the metals still remain. *Ibid*. Metals discharged into water may be in dissolved or particulate form. *Ibid*. The form of the metals is primarily determined by the chemistry of the water where the metals are present. *Ibid*. Specifically, the form of the metals depends on the levels of pH and alkalinity in the water. *Id.*, para. 16. At high pH and high alkalinity concentrations, metals precipitate and become insoluble. *Ibid*. At low pH and low alkalinity, metals dissolve in the water. *Ibid*.

Dissolved metals become part of the water and travel with the water. Bell Decl., paras. 9-10. As Dr. Bell explains, the effect of the dissolved metals is similar to that of sugar dissolved in water. Neither are visible in the water, but both change the composition of the water. Sugar imparts sweetness to water in which it is dissolved and, when metals are dissolved in water, the toxicity associated with the metals is present in the water. *Id.*, para 9. So long as the metals remain dissolved in the water, they move with the water wherever it flows. *Id.*, para. 10.

Dr. Bell has determined that the water chemistry in the Edisto River is conducive to the metals remaining in dissolved form for at least 105 miles downstream of the confluence with Bull Swamp Creek. Bell Decl., para. 23. This conclusion is based on data on the water chemistry in Bull Swamp Creek and the Edisto River collected from EPA STORET database stations. Dr. Bell analyzed data from two stations located in Bull Swamp Creek and stations located on the Edisto River at approximately 40 miles, 90 miles, 105 miles, and 133 miles

downstream of the confluence with Bull Swamp Creek.  *Id.*, paras. 17-22.

At both of the points in Bull Swamp Creek and all of the points in the Edisto River up to and including the station approximately 105 miles downstream of the confluence, the data show that the water has low alkalinity and low pH.  Bell Decl., paras. 17-21.  As discussed above, this type of water chemistry is conducive to metals dissolving in the water.  This water chemistry was not shown to change until approximately 133 miles downstream of the confluence.  *Id.*, para. 22.  Therefore, Dr. Bell concludes that for at least 105 miles downstream of the confluence, and likely somewhat beyond that point, the metals are likely to remain substantially in dissolved form and travel downstream with the flow of the water.  *Id.*, paras. 5, 23.

The same conclusion may also be reached through the application of conversion factors developed by EPA for calculating the percentage of metals that is in dissolved form.[3]  Applying the EPA conversion factors, Dr. Bell determined that 97% of the cadmium, 96% of the copper, 99% of the lead, 85% of the mercury, 99% of the nickel, and 98% of the zinc that reach the confluence of Bull Swamp Creek and the Edisto River remains soluble for at least 105 miles downstream of the confluence.[4]  Bell Decl., para. 27.  In fact, as Dr. Bell explains, because the water in the Edisto River has lower hardness, pH, and alkalinity than any of the synthetic waters USEPA used to derive the conversion factors, the results obtained using the conversion factors understates the percentages of metals in dissolved form.  *Id.*, para. 26.

---

[3]EPA developed the conversion factors for use in total recoverable metals tests, which determine the amount of metals present in water, but do not differentiate between dissolved and particulate metals.  Bell Decl., para. 24.

[4]EPA conversion factors for iron are not available, but ferrous iron is close to 100% soluble in waters with low alkalinity and low pH.  Bell Decl., para. 27.

The small amounts of metals that do not dissolve are in particulate form. Bell Decl., para. 9. These metals also move downstream, but in a different manner. Metals in particulate form settle in the river sediment during low or average flows. *Id*., para. 10. During high flows, they are typically resuspended and move downstream. *Ibid*. Dr. Bell concluded that because of the high variations of flow in the Edisto River, particulate metals gradually move downstream through a process of settling, resuspension, and resettling. *Id*., paras. 11-13.

Dr. Bell's conclusion that the metals discharged by Gaston move 105 miles downstream of the confluence is further confirmed by evidence that the metals Gaston discharged are actually present in this area. Bell Decl., para. 30. Data from EPA STORET stations in Bull Swamp Creek and the Edisto River show concentrations of the metals in excess of water quality standards. *Id*., paras. 28-29. Cadmium, copper, iron, lead, nickel, and zinc were all detected in amounts that violate water quality standards. *Ibid*.

**B.** **Plaintiffs' Members Guy Jones and William Anderson Use Areas Downstream of the Confluence Affected by Gaston's Pollution**

**1.** **Guy Jones**

In addition to his trips to the confluence of Bull Swamp Creek and the Edisto River, Guy Jones has also made numerous trips to areas downstream of the confluence to which the pollutants from Gaston's facility reach. Among these areas is the route discussed above (pp. 14-15) from Slab Landing Road to Shillings Bridge Road, which includes the waters immediately downstream of the confluence. 2008 Jones Aff., para. 6.

There are also at least three other routes Mr. Jones has taken downstream of the confluence that are within the area affected by Gaston's discharge. Jones Trial Testimony, vol. I,

pp. 93-93; 2008 Jones Aff., para. 5. Mr. Jones has personally served as a guide for River Runner on all of these routes. *Ibid*. One of the routes is from Shillings Bridge Road to the Edisto Gardens in Orangeburg. Jones Trial Testimony, vol. I, p. 94; 2008 Jones Aff., para. 10. This route is entirely on the North Fork of the Edisto River. *Ibid*. He has also led trips on routes from Rowesville to Branchville and from Green Pond Church to Colleton State Park. Jones Trial Testimony, vol. I, p.94; 2008 Jones Aff., paras. 11-12. Dr. Bell has confirmed that all of these routes are within the 105-mile area to which Gaston's discharge flows. Bell Decl., para. 31. Mr. Jones has also taken personal canoe trips within this area. Jones Trial Testimony, vol. I, p. 100; 2008 Jones Aff., paras. 5, 9.



**Area on the Edisto River near Shillings Bridge Road (see Exhibits 4, 8)**



**Area on the Edisto River near Edisto Memorial Gardens in Orangeburg (see Exhibits 4, 9)**

The quality of the water in the Edisto River is of "paramount concern" to Mr. Jones. 2008 Jones Aff., para. 13. The water quality is important to his business of providing trips for the public on the Edisto River. As Mr. Jones explains (*ibid.*):

> River Runner's customers want to experience the outdoors in areas where the water is clean and pristine. On the trips that River Runner leads, trip members frequently swim, wade, and fish in the water. It is therefore important that the water quality be high in the

areas where we guide trips and that customers have no reason to believe that their health will be threatened by pollution in the water.

*See also* Jones Trial Testimony, vol. I, pp. 97-99. In addition, Mr. Jones is "concerned about the water quality in the Edisto because of the personal trips [he] take[s] on the river." 2008 Jones Aff., para. 13; *see also* Jones Trial Testimony, vol. I, pp. 97-99.

Thus, Mr. Jones has taken numerous trips in areas of the Edisto River that are affected by Gaston's discharge and is concerned about the water quality in these areas. This clearly establishes that Mr. Jones has "the requisite connection to waters in the affected area" under the Fourth Circuit's test for establishing plaintiffs' standing. *Gaston II*, 2008 WL 344689, at *8.

## 2.     William Anderson

Another FOE member, William Anderson, has also used the waters downstream of the confluence of Bull Swamp Creek and the Edisto River and has a strong interest in maintaining their cleanliness. Dr. Anderson is a professor emeritus of biology at the College of Charleston. Anderson Aff., para. 2. He has been a FOE member since 1999. *Id.*, para. 1.

Dr. Anderson has a long-standing interest in the Edisto River. For over 50 years, he has been making periodic visits to the Edisto River, including a number of locations downstream of the confluence with Bull Swamp Creek. Anderson Aff., para. 3. He has visited the river for recreation as well as for educational and research purposes. *Id.*, paras. 4-6.

Dr. Anderson has made visits to several locations on the North Fork and main stem of the Edisto River. These include a visit to a garden located in Orangeburg on the North Fork of the river. Anderson Aff., para. 6. In addition, he has at least twice visited the McAlhany Nature Preserve, which is located on the Edisto near St. George, to study the local biota. *Id.*, para. 5. He

also has taken a boat to an area on the river near Canadys to view a facility that was releasing ash into the river. *Id*., para. 6. Finally, he has visited Givhans Ferry State Park, which is on the river, a number of times. *Id*., para. 4. In 2003, he canoed on the Edisto upstream of the park and afterwards made a visit to the park itself. *Ibid*. He has visited the park other times for recreation and has brought his classes from the College of Charleston to view the river at the park. *Ibid*.

Dr. Bell has confirmed that all of these locations are on the Edisto River in the area that is affected by the discharge from Gaston's facility. Bell Decl., para. 32. Therefore, Dr. Anderson has a history of visiting many of the areas where the pollutants reach.

Dr. Anderson would like to return to the places he has visited on the Edisto River in the future and also to float the entire length of the River. As he explains in his affidavit (Anderson Aff., para. 7):

> As a result of my trips to the Edisto, I have developed a deep appreciation for its natural beauty and look forward to future visits. The River furnishes a relaxing and peaceful environment in which to commune with nature. All of the localities on the Edisto I have visited are beautiful and each beckons me back. I would certainly like to return to the places on the Edisto that I have previously visited. Given the time and the appropriate arrangements, I would like to float the entire length of the river.

However, Dr. Anderson is concerned about the quality of the water in the Edisto River and would be less likely to visit areas of the river that may be polluted. In his affidavit, he states: "It deeply concerns me that certain reaches of the river may be polluted, making it far less likely that I would visit those areas." *Id*., para. 8. As he explains, "I care very much about the health of the Edisto River. It is important to me that the water be of the highest quality so that it can be used for swimming, boating, and fishing and provide suitable habitat for the plants and animals that live in and adjacent to it." *Ibid*.

Thus, Dr. Anderson, like Mr. Jones, has the requisite connection to the impacted waters under the Fourth Circuit's criteria for standing because he uses areas of the Edisto River that are polluted by Gaston's discharge.  He has visited a number of the affected areas and would like to return to those areas, as well as to float down the entire river, but he is concerned about the water quality of the river.

## CONCLUSION

For the reasons given, plaintiffs' motion for summary judgment should be granted.

Respectfully submitted,


/s/ Kathleen L. Millian

BRUCE J. TERRIS
KATHLEEN L. MILLIAN
Terris, Pravlik & Millian, LLP
1121 12th Street, N.W.
Washington, DC 20005
(202) 682-2100
BTerris@tpmlaw.com
KMillian@tpmlaw.com


/s/ Robert Guild

ROBERT GUILD
ID # 2499
314 Pall Mall
Columbia, SC  29201
(803) 252-1419
BGuild@mindspring.com

June 2, 2008                                        *Counsel for Plaintiffs*