HFriends of the Earth, Inc. v. Gaston Copper Recycling Corp.
C.A.4 (S.C.),2008.
This case was not selected for publication in the Federal Reporter.Not for Publication in West's Federal Reporter See Fed. Rule of Appellate Procedure 32.1 generally governing citation of judicial decisions issued on or after Jan. 1, 2007. See also Fourth Circuit Rule 32.1 (Find CTA4 Rule 32.1)
United States Court of Appeals,Fourth Circuit.
FRIENDS OF THE EARTH, INCORPORATED; Citizens Local Environmental Action Network, Incorporated, Plaintiffs-Appellees,
v.
GASTON COPPER RECYCLING CORPORATION, Defendant-Appellant.
No. 06-1714.

Argued: Oct. 30, 2007.
Decided: Feb. 7, 2008.

**Background:** Nonprofit environmental organizations brought citizens suit against operator of smelting facility under Clean Water Act (CWA), alleging violations of operator's National Pollutant Discharge Elimination System (NPDES) permit and seeking declaratory and injunctive relief. Following bench trial, the United States District Court for the District of South Carolina, Matthew J. Perry, Jr., Senior District Judge, 9 F.Supp.2d 589, dismissed suit for lack of subject matter jurisdiction, and plaintiffs appealed. The Court of Appeals, 179 F.3d 107, affirmed. On rehearing en banc, the Court of Appeals, 204 F.3d 149, reversed and remanded. On remand, the District Court imposed civil penalties against operator. Thereafter, the District Court granted organizations' motion to amend judgment and denied defendants' post-trial motions challenging the amount of the civil penalty and plaintiffs' continued jurisdiction. Operator appealed.

**Holdings:** On subsequent appeal, the Court of Appeals held that:
(1) defendant's post-trial motion tolled time period for appealing final judgment, and
(2) limited remand was warranted for determination of factual issues as to jurisdiction.

Remanded.

West Headnotes

[1] Federal Courts 170B ⇐669

170B Federal Courts
　　170BVIII Courts of Appeals
　　　　170BVIII(E) Proceedings for Transfer of Case
　　　　　　170Bk665 Notice, Writ of Error or Citation
　　　　　　　　170Bk669 k. Commencement and Running of Time for Filing; Extension of Time. Most Cited Cases
Defendant's post-trial motion to amend findings of fact and alter or amend judgment due to trial court error in calculating a civil penalty against it by including matters not covered by notice letter served by plaintiffs was sufficient to toll time period for appealing final judgment. Fed.Rules Civ.Proc.Rule 7(b), 28 U.S.C.App.(2000 Ed.); Fed.Rules Civ.Proc.Rules 52(b), 59, 28 U.S.C.A.

[2] Federal Courts 170B ⇐947

170B Federal Courts
　　170BVIII Courts of Appeals
　　　　170BVIII(L) Determination and Disposition of Cause
　　　　　　170Bk943 Ordering New Trial or Other Proceeding

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

PLAINTIFFS'
EXHIBIT
12

170Bk947 k. Further Evidence, Findings or Conclusions. Most Cited Cases

Death of nonprofit environmental organizations' member who established organizational standing in citizens suit under Clean Water Act (CWA) against operator of smelting facility warranted limited remand on operator's appeal from entry of civil penalties against it, where Court of Appeals remained unable to determine whether organizations' remaining members had a sufficient connection to the affected area, considering the lack of information as to whether such members used the waters at the affected area or whether the runoff in question had proceeded past the known affected area. Clean Water Act, § 101 et seq., 33 U.S.C.A. § 1251 et seq.

Appeal from the United States District Court for the District of South Carolina, at Columbia. Matthew J. Perry, Jr., Senior District Judge. (3:92-cv-02574-MJP).
ARGUED: Jeffrey M. Gaba, Gardere, Wynne & Sewell, L.L.P., Dallas, Texas, for Appellant. Kathleen L. Millian, Terris, Pravlik & Millian, L.L.P., Washington, D.C., for Appellees. ON BRIEF: Stacy R. Obenhaus, Gardere, Wynne & Sewell, L.L.P., Dallas, Texas, for Appellant. Bruce J. Terris, Carolyn Smith Pravlik, Aamra S. Ahmad, Terris, Pravlik & Millian, L.L.P., Washington, D.C., for Appellees.

Before WILLIAMS, Chief Judge, TRAXLER, Circuit Judge, and LOUISE W. FLANAGAN, Chief United States District Judge for the Eastern District of North Carolina, sitting by designation.

Remanded by unpublished PER CURIAM opinion.
Unpublished opinions are not binding precedent in this circuit.PER CURIAM:
*1 Gaston Copper Recycling Corporation ("Gaston") appeals an order imposing civil penalties against it in a citizen suit brought by Friends of the Earth ("FOE") and Citizens Local Environmental Action Network ("CLEAN") under the Clean Water Act ("CWA" or "the Act"), see 33 U.S.C.A. §§ 1251-1387 (West 2001 & Supp.2007). We order a limited remand for factual findings relating to whether FOE and CLEAN (together, "Plaintiffs") continue to have standing to prosecute this suit.

I.

A.

The CWA provides that "[e]xcept as in compliance with [the Act], the discharge of any pollutant by any person shall be unlawful."33 U.S.C.A. § 1311(a) (West 2001). The Act established the National Pollutant Discharge Elimination System ("NPDES") to authorize the issuance of permits for the discharge of limited quantities of effluents, see 33 U.S.C.A. § 1342 (West 2001 & Supp.2007), and individual states are allowed to issue NPDES permits with the approval of the Environmental Protection Agency, see id. § 1342(b). The State of South Carolina has established an NPDES program administered by the Department of Health and Environmental Control ("DHEC"). See S.C.Code Ann. § 48-1-100 (1987).

The CWA is subject to private enforcement as well as public enforcement, in that "any citizen may commence a civil action on his own behalf ... against any person ... alleged to be in violation of ... an effluent standard or limitation under this chapter."33 U.S.C. § 1365(a) (West 2001). Proof of liability may result in an award of injunctive relief and the imposition of civil penalties payable to the United States treasury. See id.

B.

Gaston is a South Carolina corporation that owned and operated a metals smelting plant in Gaston, South Carolina. When Gaston purchased the plant in 1990, it was already covered by an NPDES permit issued to the prior

owner. The permit allowed Gaston to discharge non-contact cooling water and treated stormwater into the Boggy Branch of Bull Swamp Creek. Boggy Branch is a tributary of Bull Swamp Creek, which, in turn, flows into the North Fork of the Edisto River. The permit set effluent limitations and monitoring requirements and required quarterly reporting of the monitoring results. Gaston continued to operate under the original permit until March 1, 1991, when a new permit was issued.

The new permit contained Phase I limits, which were effective from March 1, 1991, to May 31, 1992, and Phase II limits, which were effective from June 1, 1992, until expiration of the permit. The Phase I effluent limits were largely the same as those of the previous permit. They applied to total suspended solids, oil and grease, iron, cadmium, copper, lead, mercury, nickel, zinc, and polychlorinated biphenyls ("PCBs"). They also contained limits on "flow," meaning the amount of wastewater that could be discharged per day. The Phase II limits were stricter for cadmium, copper, lead, mercury, zinc, and pH, and contained a limitation on biochemical oxygen demand ("BOD"). The permit contained specific requirements for monitoring and reporting and included a schedule of compliance for Gaston to satisfy its Phase II effluent limits. That schedule required Gaston to submit a preliminary engineering report by March 31, 1991; submit final plans and specifications by September 1, 1991, for any waste water treatment plant upgrade needed to meet Phase II discharge limits; and meet those Phase II limits by June 1, 1992. The 1991 permit remained in effect until June 1997.

*2 Despite the September 1, 1991, deadline, Gaston did not submit the required final plans and specifications detailing its planned improvements until December 23, 1991. DHEC approved the plans in May 1992 and issued a draft permit modification, moving back the effective date of the Phase II effluent limits until March 14, 1993. Following a public hearing regarding the proposed modification, DHEC modified the permit in March 1993 to require compliance with the Phase II limits by April 2, 1993. Gaston began building its wastewater treatment upgrade in mid-July 1992.

On July 13, 1992, Plaintiffs sent Gaston a letter ("the notice letter") alleging that Gaston had violated and continued to violate its permit's requirements "in at least the instances set forth in [an] attached chronological list of permit violations." J.A. 485. The attached list identified a total of eight violations of Phase I effluent limitations from July 1990 to September 1991 for flow, mercury, and PCBs. The letter further alleged that "[i]n addition to the attached list of violations, there appear to be instances in which the facility has failed to comply with the monitoring and reporting requirements of the permit. However, the extent of these violations cannot be determined from the information available." J.A. 485. The letter also informed Gaston that it had failed to meet its deadline for submitting its final plans and specifications to meet the Phase II limitations and failed to make modifications to its facility to meet the Phase II limits by June 1, 1992. It alleged that, as a result, "in June 1992, the facility will have violated its permit limits at least as to pH, copper, PCBs, and mercury." J.A. 486.

Plaintiffs subsequently filed this citizens suit complaint on September 14, 1992, alleging that Gaston had been discharging pollutants into a South Carolina waterway in violation of the terms of its permit in that it had failed to comply with its discharge limits, failed to monitor and report its discharge properly, and failed to adhere to its compliance schedule. Plaintiffs sought declaratory and injunctive relief, as well as the imposition of civil penalties and other statutory relief. In its answer, Gaston denied Plaintiffs' principal allegations and asserted that Plaintiffs lacked standing to prosecute the action. At the conclusion of a six-day bench trial, Gaston also argued, *inter alia,* that Plaintiffs had failed to prove any violations of which they had provided the statutorily required notice prior to filing suit. *See* 33 U.S.C.A. § 1365(b).

The district court declined to rule on the merits of the suit

and instead dismissed the complaint for lack of standing. The district court determined that Plaintiffs failed to show that any of their members had suffered an injury fairly traceable to Gaston's challenged conduct. *See Friends of the Earth, Inc. v. Gaston Copper Recycling Corp., 9 F.Supp.2d 589, 600-01 (D.S.C.1998).*

*3 A divided panel of this court affirmed on appeal. *See Friends of the Earth, Inc. v. Gaston Copper Recycling Corp., 179 F.3d 107, 116 (4th Cir.1999).* However, we subsequently granted rehearing en banc and reversed the district court decision, holding that CLEAN had established standing through its member Wilson Shealy. *See Friends of the Earth, Inc. v. Gaston Copper Recycling Corp., 204 F.3d 149, 155-64 (4th Cir.2000)* (en banc). We remanded to the district court for further proceedings, including reconsideration of whether FOE also had standing in light of the then-recently issued *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc., 528 U.S. 167, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000).See Gaston Copper Recycling, 204 F.3d at 161 n. 1.*

On remand, the district court found that Gaston violated its effluent limitations for a total of 91 days. Phase I discharge violations found by the district court concerned levels of pH, cadmium, zinc, and iron, while Phase II discharge violations concerned the same pollutants as well as oil and grease and copper. However, the court determined that because DHEC had agreed to delay the effective date of the Phase II effluent limits, Gaston was not required to comply with those stricter limits until April 2, 1993, and thus was not liable either for exceedances of those limits or failures to report such exceedances prior to that date. The court also found 396 monitoring violations and 323 violations for failing to report discharge exceedances and monitoring violations. Finally, the court found that Gaston violated its schedule of compliance for 54 days. Finding that Gaston had made a good-faith effort to comply with its permit and that it obtained no economic benefit from its non-compliance, the district court imposed a civil penalty of $2,340,000 and required Gaston to pay Plaintiffs' attorneys' fees and costs. The district court entered final judgment on July 21, 2003.

Several post-trial motions followed. On July 23, 2003, Gaston moved to amend the judgment with a filing that stated:

> Defendant moves the Court, pursuant to Federal Rules of Civil Procedure, Rule 52(b) and 59(e), to amend its findings of fact and alter or amend its judgment in accordance therewith. This Motion will be supported by a memorandum which will be submitted in the time frame established by the Court.

J.A. 238. On the same date Gaston moved for an extension of time to file an accompanying memorandum. The district court granted the extension on July 30, 2003. Then, on August 1, 2003, Gaston filed a motion ("the notice motion") in which Gaston asked the district court to alter or amend its findings on the grounds that "the Court erred in calculating the civil penalty amount by including matters not covered by the notice letter served by the plaintiffs."J.A. 266.

Plaintiffs and Gaston both also made post-trial motions relating to standing. On August 1, 2003, Plaintiffs moved to amend the judgment pursuant to Rules 52(b) and 59(e) to reflect that Shealy had died prior to the judgment but that Plaintiffs continued to have standing through FOE and CLEAN member Jones and FOE member McCullough. Plaintiffs requested that if the district court was unable to conclude based on the then-existing record that both Plaintiffs continued to have standing, Plaintiffs should be allowed to supplement the record. Plaintiffs sought to present affidavits from Shealy's widow and son asserting that they were members of CLEAN and adopting Shealy's testimony as their own. Plaintiffs also sought to present an affidavit from Jones describing his continued use of the Edisto River since the trial. Gaston opposed Plaintiffs' motion and moved on August 29, 2003, for relief from the

judgment on the ground that Plaintiffs no longer had standing to prosecute this case after Shealy's death ("the Rule 60 motion").

*4 On September 16, 2005, the district court granted Plaintiffs' August 1, 2003, motion to amend the judgment to reflect that Shealy had died but that Plaintiffs continued to have standing through Jones and McCullough. Apparently in light of that ruling, the district court denied Plaintiffs' request to supplement the record. On May 22, 2006, the district court denied Gaston's motions challenging the amount of the civil penalty and claiming that Plaintiffs no longer had standing after Shealy's death. Gaston then filed a notice of appeal on June 20, 2006.

II.

While Gaston's appeal was pending, Plaintiffs filed a motion in this court seeking dismissal of the appeal except insofar as it challenged the district court's denial of the Rule 60 motion. We deferred ruling on this motion until after oral argument. We now deny it.

As we have explained, the district court entered judgment against Gaston on July 21, 2003. It is undisputed that Plaintiffs' August 1, 2003, Rule 52(b)/ 59(e) motion tolled the time for appealing. *See* Fed. R.App. P. 4(a)(4). Because the district court granted this motion by order entered September 16, 2005, Plaintiffs contend that the time for appealing expired 30 days from that date. *See* Fed. R.App. P. 4(a)(1)(A)(ii). Since Gaston did not appeal by that time, Plaintiffs argue that we lack jurisdiction to consider an appeal of the judgment and possess jurisdiction to review only the denial of its Rule 60 motion.

Gaston notes, however, that it had filed the notice motion on August 1, 2003, within 10 court days of entry of the judgment. Gaston argues that its motion also tolled the time for appealing the final judgment, *see* Fed. R.App. P. 4(a)(4), just as Plaintiffs' motion tolled the appeal period. Because the notice motion was not denied until May 22, 2006, and because Gaston filed its notice of appeal within 30 days of that denial, Gaston maintains its appeal of the final judgment was timely.

Plaintiffs respond, in turn, that the notice motion was insufficient under Rule 7 of the Federal Rules of Civil Procedure to toll the time for filing an appeal. We disagree.

Rule 7(b) requires that a motion "shall state with particularity the grounds therefor, and shall set forth the relief or order sought."Fed.R.Civ.P. 7(b)(1). Although Rule 7(b) applies to motions under Rule 59, Rule 7"does not require ritualistic detail but rather a fair indication to court and counsel of the substance of the grounds relied on."Fed.R.Civ.P. 59 advisory committee's note (1966 amendment).

The Appendix of Forms contained within the Federal Rules of Civil Procedure provides examples of documents that "are sufficient under the rules." Fed.R.Civ.P. 84. These forms "are intended to indicate the simplicity and brevity of statement which the rules contemplate."*Id.* Form 19 illustrates the liberal standard the rules impose for determining the sufficiency of motions and thus confirms the sufficiency of the notice motion. For example, Form 19 shows that a motion to dismiss is sufficiently detailed if it seeks dismissal "because the complaint fails to state a claim against defendant upon which relief can be granted."Fed.R.Civ.P.App. Form 19.

*5[1] Here, Gaston's motion stated,

> Defendant moves the Court, pursuant to Federal Rules of Civil Procedure, Rule 52(b) and 59(e), to amend its findings of fact and alter or amend its judgment in accordance therewith. The grounds for this Motion are

that the Court erred in calculating the civil penalty amount by including matters not covered by the notice letter served by the plaintiffs.

J.A. 266. This motion clearly provided *more* specificity than Appendix Form 19 regarding the description of the legal basis for the motion.[FN*] Additionally, the record reflects that long before judgment was entered against it, Gaston fully articulated its position (in proposed findings of fact and conclusions of law) that Plaintiffs' failure to provide adequate notice prevented the court from finding Gaston liable for any of the violations eventually found by the district court. *See* J.A. 62-67. Under these circumstances, no purpose would be served by requiring Gaston to restate this position in its post-trial motion. We therefore hold that the motion was sufficient under Rule 7(b), that it tolled the time for appealing the final judgment, and that Gaston's appeal of the final judgment was timely.

III.

We now turn to Gaston's jurisdictional challenge. Gaston contends that the district court erred in holding that Plaintiffs continued to have standing to prosecute this suit after Shealy's death prior to the entry of judgment. We remand to the district court for further proceedings regarding this issue.

Article III of the Constitution restricts federal court jurisdiction to the resolution of "cases" and "controversies," and the requirements of establishing Article III standing enforce this jurisdictional restriction. *See Elk Grove Unified Sch. Dist. v. Newdow,* 542 U.S. 1, 11, 124 S.Ct. 2301, 159 L.Ed.2d 98 (2004). "The standing requirement is designed to guarantee that the plaintiff has a sufficient personal stake in the outcome of a dispute to render judicial resolution of it appropriate." *Emery v. Roanoke City Sch. Bd.,* 432 F.3d 294, 298 (4th Cir.2005) (internal quotation marks omitted). When a plaintiff dies and no other plaintiff maintains a continuing interest in the litigation, the federal courts no longer have jurisdiction over the case. *See Laidlaw Envtl. Servs.,* 528 U.S. at 192, 120 S.Ct. 693.

Here, Plaintiffs are both associations consisting of their individual members. An association has

> standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and, (c) neither the claim asserted, nor the relief requested, requires the participation of individual members in the lawsuit.

*Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977). There is no dispute in this case regarding the latter two elements. The jurisdictional issue here involves only the first element. The question, then, is whether any of the Plaintiffs' members satisfies the general requirements for individual standing.

*6 To demonstrate that its members have standing, an organization bears the burden of proving that: 1) at least one of its members has suffered an actual or threatened injury; 2) the injury is "fairly traceable" to the defendant's actions; and 3) the injury will likely be redressed if it prevails in the lawsuit. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560-61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (internal quotation marks and alteration omitted).

The Supreme Court has made clear that a plaintiff need not show a traditional trespass on property or tortious injury to satisfy the actual-or-threatened-injury requirement. *See Gaston Copper Recycling,* 204 F.3d at 154. Rather, damage to an individual's "aesthetic or recreational interests" may be sufficient. *Id.* However, "because these and other noneconomic interests may be

widely shared, the Supreme Court has cautioned that environmental plaintiffs must themselves be 'among the injured.' "*Id.* Otherwise, the case or controversy requirement would be essentially meaningless. *See id.*

[2] Gaston maintains that Plaintiffs have not established that their members are "among the injured" because they have not shown that the members have the proper connection to the affected water. We conclude that the record is not sufficiently clear for us to decide whether that is true.

According to his testimony, Jones, a member of CLEAN and FOE, is a retailer of canoes, kayaks, and other outdoor equipment and provides canoe trips for the general public. His business takes canoe trips that he often leads on the Edisto River downstream from Gaston's discharge point. Jones testified that guides on a canoe trip tend to go into the water, as do the clients. Clients also picnic and fish. Jones testified that he was concerned about the quality of the rivers in which he canoes because his "business is very much dependent upon the public's perception that water quality is good."J.A. 446. Regarding his understanding of water quality, Jones testified that "on the Edisto the heavy metals that may be present from the Gaston Copper plant pose a very real concern."J.A. 446. Jones stated that his belief regarding the amount of pollution in the river affected his enjoyment of canoeing and swimming in that he had "greater confidence in [his] ability to market [his] trips to the general public when [he was] taking people into an area [where] they [would] have a quality experience and [where] their health is going to be not threatened by the quality of the water."J.A. 447. Jones stated that in light of the pollution that may be flowing from Gaston's plant, he was "concerned" about the quality of the water at issue even "aside from [his] business interests." J.A. 449.

McCullough, an FOE member, testified that he boated and scuba-dived in "Pond Pond," J.A. 452, and that he was planning to dive again downstream from that area. He testified that he planned to go canoeing on the Edisto in Colleton State Park. He described both locations as being downstream of Edisto's North Fork. When asked about whether he was concerned about the quality of the water in which he boated and went scuba-diving, McCullough stated that he "would like to dive in water that is relatively clean" and that he was "concerned about all waters in South Carolina that [he went scuba-diving in] having contaminants, especially heavy metals [and] pesticide runoff."J.A. 453. He said that if he knew water contained contaminants, he would be less likely to dive in it and if he "thought the water was polluted, [he] would be less likely to go canoeing in that particular spot and ... would go to a different spot that [he believed] would be less polluted or not polluted at all."J.A. 455.

*7 Gaston argues that Jones's and McCullough's *concern* for the water they use is not a sufficiently concrete injury to establish standing in the absence of evidence that the water quality was actually affected. We disagree. A plaintiff is not required to present "additional scientific proof [of actual harm to the environment] where there was a direct nexus between the claimant and the area of environmental impairment."*Gaston Copper Recycling,* 204 F.3d at 159. That point is illustrated by *Sierra Club v. Cedar Point Oil Co.,* 73 F.3d 546 (5th Cir.1996), a decision we cited with approval in our previous en banc opinion in the present case, *see Gaston Copper Recycling,* 204 F.3d at 159-60. There, the Fifth Circuit held that citizens' concern about water quality in Galveston Bay sufficed as injury in fact where "[t]wo of the affiants live near Galveston Bay and all of them use the bay for recreational activities."*Cedar Point Oil Co.,* 73 F.3d at 556. The court held that it was sufficient that "the affiants expressed fear that the discharge ... will impair their enjoyment of these activities because these activities are dependent upon good water quality."*Id.*

Relying on *Friends of the Earth v. Crown Central Petroleum Corp.,* 95 F.3d 358 (5th Cir.1996), Gaston also contends that Jones's and McCullough's testimony was insufficient to establish standing. In *Lujan,* the Supreme

Court explained that a "plaintiff claiming injury from environmental damage must use the area affected by the challenged activity and not an area roughly 'in the vicinity' of it."*Lujan,* 504 U.S. at 565-66, 112 S.Ct. 2130. In *Crown Central,* the Fifth Circuit applied that principle to conclude that downstream users located 18 miles and three tributaries from the point of discharge could not establish standing since injury could not be fairly traceable to a discharger based simply on the "truism that water flows downstream." *Crown Cent.,* 95 F.3d at 361. Gaston argues here that Plaintiffs have established only that their members used water downstream of the point to which its discharge flowed, and that that is not sufficient to satisfy the *Lujan* standard.

We are unable, considering the current state of the record, to determine whether Plaintiffs' members have a sufficient connection to the affected area. In our previous en banc decision in this case, we held that CLEAN established standing because Shealy owned a home and lake four miles downstream from Gaston's discharge and "that Gaston Copper's discharges can impact the receiving waterway for a good distance downstream-well past Shealy's property and on down to the Edisto River itself."*Gaston Copper Recycling,* 204 F.3d at 158. In reaching that conclusion, we relied primarily on evidence of an official written response from DHEC to the owner of a piece of property at the location where Bull Swamp Creek flows into the Edisto River. The owner asked if the runoff would reach his property. The response stated that the runoff would, in fact, "go to Boggy Branch to Bull Swamp to the Edisto River" and added that "[t]he confluence of Bull Swamp and the Edisto River is 16.5 miles [from the polluting facility]."*Id.* at 158 (internal quotation marks & alteration omitted).

*8 Regarding Jones, Plaintiffs established that Gaston's runoff flowed into the North Fork of the Edisto River and that Jones used waters of the Edisto's North Fork. Concerning which part of the North Fork Jones used, Jones testified:

[W]e canoe from the main stem, an area that is described as Green Pond Church, to Colleton State Park. Another area is from Shill's ... Bridge to the Edisto Gardens in Orangeburg, and another is from a location called Rowesville down to a location called Branchville.

J.A. 442-43. Jones testified that he believed that all of these areas were downstream of Bull Swamp Creek. Like Jones, McCullough did not specifically testify that he had used, or even planned to use, waters between Gaston's facility and the Bull Swamp Creek.

Gaston observes that in our previous en banc decision, we stated that the confluence of Bull Swamp Creek and the Edisto River was "the acknowledged outer perimeter of the discharge zone,"*Gaston Copper Recycling,* 204 F.3d at 158. Gaston maintains that because Jones's and McCullough's use of the North Fork was downstream of that confluence, they used waters only "roughly 'in the vicinity' of" the affected area. *Lujan,* 504 U.S. at 566, 112 S.Ct. 2130. Gaston's argument fails to take into account the context of the statement on which it relies. The DHEC response that we referenced in our previous opinion did not purport to identify the *farthest* point downstream to which the runoff proceeded. Rather, it addressed only whether the runoff proceeded *as far as* the confluence of Bull Swamp Creek and the North Fork of the Edisto River. DHEC acknowledged that it did proceed that far, and DHEC had no reason to discuss to what extent the runoff proceeded further. Thus, our description of the confluence as the "acknowledged outer perimeter of the discharge zone" conveyed only that it was the farthest point that DHEC had acknowledged the runoff proceeded, not that DHEC acknowledged that that was the farthest point the runoff reached.

The problem we are left with, however, is that we cannot determine whether Jones or McCullough had the requisite connection to waters in the affected area without knowing either that they used the waters at the confluence of Bull Swamp Creek and the Edisto's North Fork or knowing

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

how much farther beyond the confluence that the runoff proceeded and where, in relation to this point, the waters that Jones and McCullough used and planned to use were. We therefore order a limited remand so that the district court may resolve these factual issues. Because the scope of our remand is narrow and this case has been pending for such a very long time, we request a response from the district court as soon as is practical.

### IV.

In sum, we deny Plaintiffs' motion for partial dismissal of this appeal, and we order a limited remand to the district court.

*REMANDED.*

> FN* Plaintiffs contend that a Rule 52(b)/59(e) motion must state its grounds more specifically than a 12(b)(6) motion, but we know of no reason why that would be the case.

C.A.4 (S.C.),2008.
Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.
Slip Copy, 2008 WL 344689 (C.A.4 (S.C.)), 65 ERC 1999

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.