UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| FRIENDS OF THE EARTH, INC., *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) |
| | ) Civil No. 3:92-2574-O |
| GASTON COPPER RECYCLING CORPORATION, | ) |
| | ) |
| | ) |
| Defendant. | ) |
| | ) |

**PLAINTIFFS' REPLY BRIEF IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT THAT THEY HAVE STANDING TO CONTINUE THIS ACTION**

**INTRODUCTION**

This case has now gone on for over 16 years, but it all has come down to a simple fact. Gaston Copper Recycling Corporation ("Gaston") admits that if plaintiffs' member Guy Jones used the waters at the confluence of Bull Swamp Creek and the North Fork of the Edisto River ("confluence") prior to Wilson Shealy's death on September 22, 2002, then plaintiffs have maintained their standing throughout this case. Defendant's Response to Plaintiffs' Brief on Standing ("Def. Br."), p. 7. Although Gaston attempts to create uncertainty as to this fact, it has already been proven and is undisputed by Gaston: In his May 29, 2008 affidavit, Mr. Jones stated that he has guided trips on a route that includes the confluence and recalled a particular trip on this route that took place in 2000, well before Mr. Shealy's death. Affidavit of Guy Jones, May 29, 2008 (Pl. Ex. 2) ("May 2008 Jones Aff."), paras. 6, 9; *see also* Affidavit of Guy Jones, September 25, 2008 (attached hereto as Plaintiffs' Exhibit 13) ("Sept. 2008 Jones Aff."), paras. 2-3. Now, with this reply brief, Mr. Jones explains further in another affidavit that he has taken trips to the confluence

for approximately 25 years. Sept. 2008 Jones Aff., para. 4. It is thus clear beyond doubt that Mr. Jones began using the waters at the confluence long before Mr. Shealy's death.

There can be no dispute that the test of the Court of Appeals for the Fourth Circuit for establishing plaintiffs' standing has been satisfied. The Fourth Circuit determined that the waters at the confluence are affected by Gaston's pollution. *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 158 (4th Cir. 2000) (*en banc*) ("*Gaston I*"); *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 263 Fed. Appx. 348, 355-356 (4th Cir. 2008) ("*Gaston II*"). To establish their standing, plaintiffs were required only to demonstrate that at least one of their members uses these waters. *Id*. at 356. They have presented clear evidence proving this point. As shown below in Part I below, plaintiffs are entitled to summary judgment.

While Mr. Jones' trips to the confluence are sufficient to establish plaintiffs' standing, the lesson of this case has been that circumstances may change in the course of extended cases and it is wise not to rely on a single member for standing. Plaintiffs therefore also submitted evidence demonstrating that metals discharged from Gaston's facility reach at least 105 miles downstream of the confluence and that FOE member William Anderson, as well as Mr. Jones, has used the waters within this area. Affidavit of William D. Anderson, Jr., May 29, 2008 (Pl. Ex. 4) ("Anderson Aff."), paras. 3-6; May 2008 Jones Aff., paras. 4-6, 10-12; Declaration of Bruce A. Bell, Ph.D, P.E., BCEE, May 30, 2008 (Pl. Ex. 1) ("May 2008 Bell Decl."), paras. 23, 27, 31-32. Dr. Anderson began using these waters long before Mr. Shealy's death. Anderson Aff., paras. 3-6. Consequently, he also has had standing before and since the time of Mr. Shealy's death.

Gaston does not dispute plaintiffs' evidence that the metals will reach at least 105 miles downstream of the confluence. Instead, it responds by challenging the Fourth Circuit's

for approximately 25 years. Sept. 2008 Jones Aff., para. 4. It is thus clear beyond doubt that Mr. Jones began using the waters at the confluence long before Mr. Shealy's death.

There can be no dispute that the test of the Court of Appeals for the Fourth Circuit for establishing plaintiffs' standing has been satisfied. The Fourth Circuit determined that the waters at the confluence are affected by Gaston's pollution. *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 204 F.3d 149, 158 (4th Cir. 2000) (*en banc*) ("*Gaston I*"); *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*, 263 Fed. Appx. 348, 355-356 (4th Cir. 2008) ("*Gaston II*"). To establish their standing, plaintiffs were required only to demonstrate that at least one of their members uses these waters. *Id*. at 356. They have presented clear evidence proving this point. As shown below in Part I below, plaintiffs are entitled to summary judgment.

While Mr. Jones' trips to the confluence are sufficient to establish plaintiffs' standing, the lesson of this case has been that circumstances may change in the course of extended cases and it is wise not to rely on a single member for standing. Plaintiffs therefore also submitted evidence demonstrating that metals discharged from Gaston's facility reach at least 105 miles downstream of the confluence and that FOE member William Anderson, as well as Mr. Jones, has used the waters within this area. Affidavit of William D. Anderson, Jr., May 29, 2008 (Pl. Ex. 4) ("Anderson Aff."), paras. 3-6; May 2008 Jones Aff., paras. 4-6, 10-12; Declaration of Bruce A. Bell, Ph.D, P.E., BCEE, May 30, 2008 (Pl. Ex. 1) ("May 2008 Bell Decl."), paras. 23, 27, 31-32. Dr. Anderson began using these waters long before Mr. Shealy's death. Anderson Aff., paras. 3-6. Consequently, he also has had standing before and since the time of Mr. Shealy's death.

Gaston does not dispute plaintiffs' evidence that the metals will reach at least 105 miles downstream of the confluence. Instead, it responds by challenging the Fourth Circuit's

determination that the waters at the confluence are affected by Gaston's discharge. Def. Br. 18-21. But this Gaston may not do. The Fourth Circuit has already considered Gaston's arguments on standing in two appeals and rejected any argument that the area at the confluence is not affected by Gaston's discharge. This Court is bound by the Fourth Circuit's determination. Gaston also makes assertions concerning the water quality of Bull Swamp Creek and the Edisto River (Def. Br. 16-17, 20-22), but these assertions are based upon flawed evidence and, more importantly, are irrelevant to the standing analysis.

Based on the Fourth Circuit's holding, the rest of the analysis becomes straightforward. Plaintiffs' evidence shows that at least 97% of the cadmium, 96% of the copper, 99% of the lead, 85% of the mercury, 99% of the nickel, and 98% of the zinc from Gaston's discharge that reaches the confluence will travel in the Edisto River at least 105 miles downstream of the confluence. May 2008 Bell Decl., para. 27. Thus, the waters at least 105 miles downstream of the confluence are affected by Gaston's discharge almost as much as the waters at the point of the confluence. Its talk of "molecules" notwithstanding, Gaston has failed to show that there is any significant difference in the amounts of Gaston's metals at the confluence and those in areas downstream of the confluence. As shown in Part II below, plaintiffs are therefore entitled to summary judgment as to their standing.

Gaston requests that the Court make findings of fact and conclusions of law under Rule 52 rather than ruling on plaintiffs' motion for summary judgment under Rule 56. Def. Br. 1. However, Rule 52 applies only to non-jury trials. Plaintiffs submit that since the undisputed evidence conclusively shows their standing, summary judgment is proper. Plaintiffs have submitted a revised proposed summary judgment order which includes proposed findings. If, however, the Court

concludes that the standing question cannot be resolved based on the parties' submissions, plaintiffs request a trial.

It is finally time to bring resolution to the standing question. It is only because of the unusually protracted nature of this litigation that it has been necessary to address plaintiffs' standing again at all. Mr. Shealy died in 2002, a full 10 years after this case was filed and years after the violations at issue occurred. The Fourth Circuit has requested a response from this Court "as soon as is practical." *Gaston II*, 263 Fed. Appx. at 356. Based on the evidence presented by plaintiffs, this issue should finally be resolved.

## ARGUMENT

### I.

### PLAINTIFFS HAVE STANDING BASED ON GUY JONES' USE OF THE WATERS AT THE CONFLUENCE

**A.  Plaintiffs Are Entitled to Summary Judgment since Gaston Has Not Raised a Material Issue of Fact under Rule 56**

Plaintiffs have moved for summary judgment under Rule 56 that they have standing to continue this action. They have supported their motion for summary judgment with, *inter alia*, evidence that, prior to the death of Wilson Shealy, Guy Jones used the waters at the confluence. As Gaston agrees, proof of this fact alone is a sufficient basis for finding that plaintiffs have standing. Def. Br. 7. As discussed below, since plaintiffs have made this factual showing and Gaston has not put this fact in dispute, summary judgment must be awarded to plaintiffs.

In order to oppose plaintiffs' motion for summary judgment, Gaston was required to show a genuine issue of fact as to Mr. Jones' use of the confluence. Rule 56(e)(2) states:

> When a motion for summary judgment is properly made and supported, an opposing party

may not rely merely on allegations or denials in its own pleading; rather, its response must – by affidavits or as otherwise provided in this rule – set out specific facts showing a genuine issue of fact for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party.

The opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-257 (1986); *Celotex v. Catrett*, 477 U.S. 317, 323-327 (1986). "[C]onclusory allegations or denials, without more, are insufficient to preclude the granting of the summary judgment motion" (citation omitted). *Lasher v. Day & Zimmerman International, Inc.*, 516 F. Supp. 2d 565, 576 (D.S.C. 2007).

Gaston has not provided any evidence disputing the fact that Mr. Jones used the waters at the confluence before the death of Mr. Shealy. Instead, Gaston requested that rather than deciding plaintiffs' motion for summary judgment, the Court make findings under Rule 52. However, Rule 52 is not applicable here because it applies only to non-jury trials. Even if this were otherwise, Gaston does not have the liberty of simply choosing to ignore plaintiffs' motion for summary judgment. There is only one way for Gaston to defeat plaintiffs' motion for summary judgment, and that is by showing there is a genuine issue as to this material fact under Rule 56. Gaston has failed to do this. Therefore, plaintiffs' summary judgment motion should be granted.

**B.     Guy Jones Began Visiting the Confluence in the 1980's, Well before the Death of Wilson Shealy**

The Fourth Circuit has held that the waters at the confluence are affected by Gaston's pollution. *Gaston I*, 204 F.3d at 158; *Gaston II*, 263 Fed. Appx. at 355-356. In its response to plaintiffs' motion for summary judgment, Gaston admitted that if Mr. Jones used the waters at the confluence prior to the date of Mr. Shealy's death on September 22, 2002, plaintiffs can rely on this

5

fact to establish their continued standing. Def. Br. 7. In Gaston's view, this fact has not yet been proven. Gaston is incorrect.

Mr. Jones has already submitted evidence demonstrating that he visited the confluence before Mr. Shealy's death. May 2008 Jones Aff., para. 9. He is now submitting further evidence to show that he has been visiting the confluence since the 1980's.[1] Sept. 2008 Jones Aff., para. 4.

Gaston admits that Mr. Jones has "taken numerous trips and conducted river tours that passed the point of confluence" and went to the confluence "some time prior to 2003." Def. Br. 3. Apparently, Gaston is resting its last hope for attacking Mr. Jones' standing on a perceived possibility that Mr. Jones' "numerous trips" began some time in the short period between Mr. Shealy's death on September 22, 2002, and 2003.

In fact, Gaston has already been proven wrong. Mr. Jones has already discussed his trips to the confluence in two affidavits, one executed on September 30, 2003, and one executed on May 29, 2008. In his May 29, 2008 affidavit, Mr. Jones stated that he has been guiding trips on the Edisto River for approximately 25 years and that one of the routes of these trips begins at Slab Landing Road and includes the point of the confluence. May 2008 Jones Aff., paras. 5-6. He recalled that

---

[1] Gaston is wrong that Mr. Jones testified at trial in 1995 that his trips went "no closer" to the confluence than Shillings Bridge Road. See Def. Br. 9. Mr. Jones never testified to any such thing. See Jones Trial Testimony, Trial Tr., vol. I, p. 100, line 15 (full testimony of Guy Jones attached hereto as Plaintiffs' Exhibit 15) (Mr. Jones states that he canoes the areas previously mentioned in his testimony "and others as well."). He simply was not asked at trial, on either direct examination or cross-examination, the specific question as to whether he had canoed at the confluence of Bull Swamp Creek and the North Fork of the Edisto River. See Jones Trial Testimony (Pl. Ex. 15).

After Mr. Shealy's death, the facts concerning Mr. Jones' use of the waters at the confluence became of more importance. Since then, Mr. Jones has provided affidavits explaining in further detail the extent of his use of the North Fork of the Edisto River at its confluence with Bull Swamp Creek and downstream. Moreover, even assuming *arguendo*, and contrary to his affidavit testimony, that Mr. Jones had not canoed at the confluence as of the time of his trial testimony in July 1995, he has established in affidavit testimony that he did so before the death of Mr. Shealy.

he guided a group of Russian citizens participating in an exchange program on this route in 2000. *Id*., para. 9.

In the face of such clear evidence that Mr. Jones visited the confluence in 2000, well before Mr. Shealy's death, Gaston must go to great lengths to attempt to manufacture uncertainty. It does this by asserting that Mr. Jones' affidavit merely stated he went "*near*" the confluence in 2000 (emphasis in original). Def. Br. 8. This is a mischaracterization of Mr Jones' affidavit. Mr. Jones stated that in 2000, he guided the Russian citizens on a trip "<u>starting</u> near the confluence" (emphasis added). May 2008 Jones Aff., para. 9. This was a clear reference to the route beginning at Slab Landing Road that Mr. Jones had already described in the same affidavit. *See id*., para. 6. As Mr. Jones stated, that route "begins just upstream of the confluence of Bull Swamp Creek and the Edisto River and continues downstream past the confluence." *Ibid*. The route thus "takes guides and customers exactly to the point of the confluence." *Ibid*. Therefore, even relying only on the two affidavits Mr. Jones has already submitted, it is clear that Mr. Jones visited the confluence at least in 2000, well before Mr. Shealy's death.

While summary judgment may be granted based on Mr. Jones' first two affidavits alone, Mr. Jones has submitted an additional affidavit with this reply brief providing further details on the time period of his trips to the confluence. This affidavit shows that Mr. Jones has been visiting the confluence since the 1980's. Mr. Jones states that he "began making trips to the confluence of Bull Swamp Creek and the North Fork of the Edisto River in the 1980's and continued making trips to that location in the 1990's and 2000's." Sept. 2008 Jones Aff., para. 4. Thus, Mr. Jones has been using the waters at the confluence for approximately the same 25 years that his business, River Runner Outdoor Center, has been in operation. *See id.*, para. 4; May 2008 Jones Aff., para. 3. He

states that while it is difficult for him to remember the dates of the hundreds of canoe trips he has taken over the 25-year period, he recalls that the trip with the Russian citizens mentioned in his first affidavit took place on or about March 11, 2000, because that was the date of his fiftieth birthday. Sept. 2008 Jones Aff., para. 3. He also states that he took a trip to the confluence with Brent Blackwelder, president of Friends of the Earth, and Robert Guild, one of plaintiffs' counsel in this case, in approximately 1999. *Id*., para. 5. Moreover, he reaffirms that he plans to continue making trips to the confluence in the future. *Id*., para. 6.

Mr. Jones has now submitted three affidavits detailing his trips to the confluence of Bull Swamp Creek and the North Fork of the Edisto River. His most recent affidavit further clarifies that he has been visiting the confluence since the 1980's, well before Mr. Shealy's death. Quite simply, by demonstrating that Mr. Jones has been using the waters at the confluence for approximately 25 years and plans to continue this use in the future, plaintiffs have satisfied the Fourth Circuit's test for establishing their standing.

## II.

### PLAINTIFFS HAVE STANDING BASED ON THEIR MEMBERS' USE OF DOWNSTREAM WATERS WITHIN THE ZONE OF GASTON'S DISCHARGE

The Fourth Circuit has already determined that the "affected area" includes the confluence of Bull Swamp Creek and the North Fork of the Edisto River. *Gaston II*, 263 Fed. Appx. at 356. It ordered that this remand address "how much farther <u>beyond the confluence</u> [Gaston's] runoff proceeded" (emphasis added). *Ibid*. Plaintiffs have analyzed precisely this question. Relying on the Fourth Circuit's determination that the pollution reaches the confluence, plaintiffs began their analysis at the confluence. Dr. Bruce Bell concluded that a substantial percentage of the metals from

8

Gaston's discharge that reach the confluence will travel on the Edisto River at least 105 miles downstream of that point.[2] May 2008 Bell Decl., para. 23. Dr. Bell concluded that at least 97% of the cadmium, 96% of the copper, 99% of the lead, 85% of the mercury, 99% of the nickel, and 98% of the zinc will move at least this distance from the confluence. *Id.*, para. 27. Plaintiffs demonstrated that both Mr. Jones and Dr. Anderson have used the waters within this 105-mile range at multiple locations. May 2008 Jones Aff., paras. 4-6, 10-12; Anderson Aff., paras. 3-6; May 2008 Bell Decl., paras. 31-32.

Gaston, on the other hand, presented no evidence of the distance its metals travel from the confluence. Recognizing, as it must, the Fourth Circuit's finding that the confluence is affected by Gaston's pollution, Gaston instead argues that "[t]he 'affected area' does not extend beyond the confluence." Def. Br. 18. Even without considering evidence submitted by either expert, it is easy to see at once how implausible Gaston's argument is. The Fourth Circuit has already held that the waters at the confluence are affected, but, according to Gaston's argument, the affected area does not extend even slightly past the confluence. According to Gaston, the metals just disappear at the confluence.

The basis for the Fourth Circuit's finding was a response from the South Carolina Department of Health and Environmental Control ("DHEC") to an owner of property "at the location where Bull Swamp Creek flows into the Edisto River." *Gaston II*, 263 Fed. Appx. at 355. The owner had asked if the runoff from Gaston's facility would reach his property, and DHEC responded

---

[2] Dr. Bell concluded that the metals will travel 105 miles because pH and alkalinity in the Edisto River are constant to this point. May 2008 Bell Decl., paras. 17-23; Second Declaration of Bruce A. Bell, Ph.D., P.E., BCEE, September 17, 2008 ("Sept. 2008 Bell Decl.") (attached hereto as Plaintiffs' Exhibit 14), para. 4.

9

that "the runoff would, in fact, 'go to Boggy Branch to Bull Swamp Creek to the Edisto River'" (citation omitted). *Ibid*. The Fourth Circuit has already recognized that this statement "did not purport to identify the *farthest* point downstream to which the runoff proceeded" (emphasis in original). *Id*. at 356. "Rather, it addressed only whether the runoff proceeded *as far as* the confluence of Bull Swamp Creek and the North Fork of the Edisto River. DHEC acknowledged that it did proceed that far, and DHEC had no reason to discuss to what extent the runoff proceeded further" (emphasis in original). *Ibid*.

Yet Gaston apparently believes that by some striking coincidence, the concerned property owner who contacted DHEC just happened to live at the very farthest point reached by Gaston's discharge (even though DHEC said no such thing). Gaston provides no explanation for why it believes the affected area ends so abruptly.

Having offered no analysis of its own of the distance the metals travel, except to agree that the metals "may theoretically be present" downstream of the confluence (Def. Br. 18), Gaston makes two main arguments why the affected area does not extend beyond the confluence. One is a thinly veiled challenge to the Fourth Circuit's ruling that the area at the confluence is affected by Gaston's discharge. The second is an attempt to shift the focus to the water quality of the Edisto River, even though both the Supreme Court and the Fourth Circuit have determined that evidence concerning water quality is not required either for finding Clean Water Act violations or establishing standing. Gaston's arguments are clearly erroneous.

**A. Gaston May Not Challenge the Fourth Circuit's Ruling that the Waters at the Confluence Are "Affected" by Gaston's Pollution**

The Fourth Circuit has already made an unequivocal finding that the area at the confluence

10

is affected by Gaston's discharge. In its 2000 *en banc* decision, the Fourth Circuit stated that "the clear implication of DHEC's response is that Gaston Copper's discharges can impact the receiving waterway for a good distance downstream – * * * on down to the Edisto River itself." *Gaston I*, 204 F.3d at 158. In 2008, the Fourth Circuit reaffirmed this conclusion and clarified that there had been no finding as to "the *farthest* point downstream to which the runoff proceeded" (emphasis in original). *Gaston II*, 263 Fed. Appx. at 356. It then ordered that this remand address whether plaintiffs' members used the "affected area * * * at the confluence of Bull Swamp Creek and the Edisto's North Fork" and "how much farther <u>beyond the confluence</u> that the runoff proceeded" (emphasis added). *Ibid*.

Despite the Fourth Circuit's clear finding that the "affected area" includes the confluence, Gaston argues that "there is no evidence that the waters <u>at</u> or beyond the point of confluence are 'affected'" (emphasis added). Def. Br. 18; *see also id*., p. 19 ("The record * * * provides no support for a conclusion that the waters *at or near the confluence* were 'affected' by the discharge" (emphasis in original)). Gaston claims that DHEC described merely "the flow in the watershed from the Gaston Copper facility to the Edisto River" and "made no statement about the ability of this discharge to 'impact' water quality or to justify a reasonable concern from an affect [sic] of the discharge at any point at or beyond the confluence." *Ibid*. This is directly contrary to the Fourth Circuit's statements that "[c]ommon sense dictates that the purpose of the question [to DHEC] was to determine just how far downstream Gaston Copper's discharge would <u>affect</u> property owners" and that DHEC's response indicated that "Gaston Copper's discharges can <u>impact</u> the receiving waterway * * * on down to the Edisto River" (emphases added). *Gaston I*, 204 F.3d at 158. The Fourth Circuit clearly saw that there would have been no need for DHEC simply to explain that

11

water flowed from Bull Swamp Creek into the Edisto River to an owner of property at the very point where those waters met; rather, DHEC was addressing whether the discharge would reach the waters at that location.

Gaston also attempts to undercut the Fourth Circuit's conclusion by arguing that pollutants discharged from Gaston's facility would be "diluted" and "reduced" before "mix[ing] in the North Fork." Def. Br. 21. Gaston argues that this dilution occurs even before the water reaches the confluence. *Ibid*. Even assuming that Gaston's statements concerning dilution were accurate,[3/] this would not mean that the metals do not reach the confluence – they simply would be present in a greater volume of water. The clear import of DHEC's response and the Fourth Circuit's decisions is that any dilution that occurred did not prevent a finding that the waters at the confluence were within the range of Gaston's discharge.

Gaston's challenges to the Fourth Circuit's findings are clearly precluded by the "'mandate rule,'" which "'prohibits lower courts, with limited exceptions, from considering questions that the mandate of a higher court has laid to rest'" (citation omitted). *Moore v. Bennette*, 517 F.3d 717, 727 (4th Cir. 2008). As the Fourth Circuit has stated, "absent exceptional circumstances, the mandate rule 'compels compliance on remand with the dictates of a superior court and forecloses relitigation of issues expressly or impliedly decided by the appellate court.'" *Volvo Trademark Holding Aktiebolaget v. Clark Machinery Co.*, 510 F.3d 474, 481 (4th Cir. 2007) (citing *United States v. Bell*, 5 F.3d 64, 66 (4th Cir.1993)); *see also*, *e.g.*, *Invention Submission Corp. v. Dudas*, 413 F.3d 411, 415 (4th Cir. 2005) ("[F]ew legal precepts are as firmly established as the doctrine that the mandate of

---

[3/]As Dr. Bell explains in his second declaration, Gaston's claim that the concentrations of metals it discharges are reduced by dilution is not supported by the data. Sept. 2008 Bell Decl., para. 17.

a higher court is 'controlling as to matters within its compass'" (citation omitted)). Thus, on this remand, the Fourth Circuit's findings in its two decisions considering plaintiffs' standing are controlling. The mandate rule forecloses Gaston's attempted "relitigation" of issues the Fourth Circuit has "laid to rest."

**B. Gaston's Assertions Concerning Water Quality Are Irrelevant to Determining Plaintiffs' Standing**

Gaston's second strategy is to argue that to establish their standing, plaintiffs are required to prove an "effect" on water quality caused by Gaston's discharge. Def. Br. 15. This view, however, rests upon a fundamental misunderstanding of environmental standing requirements and the Clean Water Act and has been repudiated by the Supreme Court and Fourth Circuit. As shown below, Gaston's statements concerning water quality are misleading and inaccurate, but more importantly, they are irrelevant to determining plaintiffs' standing.[4]

As Gaston concedes, the relevant showing for establishing standing is not harm to the environment, but injury to the plaintiff. *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 181 (2000); Def. Br. 11. The Supreme Court has explained that, to require proof of environmental harm, would "raise the standing hurdle higher than the necessary showing for success on the merits in an action alleging noncompliance with an NPDES permit." *Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, supra, 528 U.S. at 181. In *Laidlaw*, the Court rejected the lower court's finding that the plaintiffs lacked standing because "there had been 'no demonstrated proof of harm to the environment.'" *Ibid*.

---

[4] In his first declaration, Dr. Bell analyzed water quality data from monitoring stations on the Edisto River, but the purpose of this was to confirm that the metals discharged by Gaston were reaching the areas downstream on the Edisto, not to determine the effect of Gaston's discharge upon water quality. May 2008 Bell Decl., para. 28-30; Sept. 2008 Bell Decl., para. 6.

13

As the Fourth Circuit explained in this very case, through the Clean Water Act, Congress intended to remove the need for courts to determine whether a defendant's discharge had directly impacted water quality (*Gaston I*, 204 F.3d at 151):

> The Clean Water Act * * * shifted the focus of federal enforcement efforts from water quality standards to direct limitations on the discharge of pollutants - i.e., "effluent limitations." Whereas the previous scheme required proof of actual injury to a body of water to establish a violation, Congress now instituted a regime of strict liability for illegal pollution discharges. Government regulators were therefore freed from the "need to search for a precise link between pollution and water quality" in enforcing pollution controls. Rather, they could simply determine whether a company was emptying more pollutants into the water than the Act allowed in order to detect a violation of the statute. (citations and alteration omitted)

Thus, to insist upon "proof of actual injury to a body of water," as Gaston argues this Court must do, "would necessitate the litigation of complicated issues of scientific fact that are entirely collateral to the question Congress wished resolved – namely, whether a defendant has exceeded its permit limits." *Id*. at 162. Despite Gaston's arguments to the contrary, "direct evidence of impairment" simply is not required. *Id*. at 163.

In fact, the Court of Appeals for the Fourth Circuit has already held in this case that it was error to require proof of an actual impact to the waters used by plaintiffs' members. The Fourth Circuit held that in requiring evidence of "'negative change in the ecosystem of the waterway,'" this Court was "creating evidentiary barriers to standing that the Constitution does not require and Congress has not embraced" (citation omitted). *Gaston I*, 204 F.3d at 155-156. Thus, Gaston's arguments as to water quality are irrelevant to this Court's decision concerning standing.

Rather than the impact on water quality, the proper inquiry for determining standing in this case is whether plaintiffs' members used waters within the "range of [Gaston's] discharge." *Gaston I*, 204 F.3d at 160. DHEC has already made the determination under the Clean Water Act that if

Gaston violates its discharge limits, there is a potential for environmental harm within the range of its discharge. *Id*. at 157. "Because these discharge restrictions are set at the level necessary to protect the designated uses of the receiving waterways, their violation necessarily means that these uses may be harmed." *Ibid*. Indeed, in this case, a DHEC employee specifically testified that if a discharger did not meet the limits set by DHEC, it might be interfering with the designated uses of the waterways. *Ibid*.

Gaston concedes that its discharge "theoretically" reaches the areas that plaintiffs' members use downstream of the confluence, but accuses plaintiffs of relying only on the presence of metal "molecules." Def. Br. 13, 18. This ignores the evidence that plaintiffs submitted demonstrating that at least 97% of the cadmium, 96% of the copper, 99% of the lead, 85% of the mercury, 99% of the nickel, and 98% of the zinc from Gaston's discharge that is present at the confluence will reach at least 105 miles downstream. *See* May 2008 Bell Decl., para. 27.

Plaintiffs have demonstrated that their members Mr. Jones and Dr. Anderson both use waters within the 105 miles downstream of the confluence. May 2008 Jones Aff., paras. 4-6, 10-12; Anderson Aff., paras. 3-6; May 2008 Bell Decl., paras. 31-32. There is no significant difference in the amounts of metals present at the location the Fourth Circuit has already found is affected, namely, the confluence, and those present in the downstream areas used by plaintiffs' members. Gaston offers no evidence to dispute this fact. In short, Gaston has not refuted plaintiffs' evidence that their members use areas within the range of Gaston's discharge.

**C.     Gaston's Water Quality Evidence Is Invalid**

Gaston argues that its discharge has not had a significant effect on water quality in the Edisto River. Def. Br. 16-17, 20-23. It bases this claim on an evaluation by its expert, John Durkee, of

water quality data from 1996 to the present on cadmium, copper, and zinc from two monitoring stations, one located in Bull Swamp Creek and one located on the Edisto River upstream of the confluence. *See* Declaration of John Durkee, September 2, 2008 ("Durkee Decl."), paras. 6-8, Exhibit C. Gaston also relies on a statement by Mr. Durkee that, in 2004, DHEC did not classify areas of the Edisto River as "impaired" for cadmium, copper, or zinc. Def. Br. 16; Durkee Decl., para. 5.

As discussed above, Gaston's water quality arguments are irrelevant to the standing question. They are also irrelevant to Dr. Bell's analysis of the distance that the metals travel in the Edisto River. Sept. 2008 Bell Decl., para. 6. In addition, there are also serious flaws in Gaston's evidence. As Dr. Bell states in his second declaration, "[t]he relevant data, correctly interpreted, do not support a conclusion that Gaston's discharge is having no effect on the water quality of the Edisto River." *Id*., para. 7.

Gaston's evidence on water quality is flawed for a number of reasons. First, the clearest reason is that Gaston has not even considered the relevant time period. This Court found that Gaston violated its permit hundreds of times in the period from October 1990 to April 1997. Findings of Fact and Conclusions of Law, Docket No. 166 (July 18, 2003) ("2003 Findings and Conclusions"), p. 23. Yet Mr. Durkee only considered data for the period from 1996 to the present. Durkee Decl., paras. 6-8, Exhibit C; *see* Sept. 2008 Bell Decl., para. 9. Thus, the data he reviewed tell nothing about the time period during which most of Gaston's violations occurred. In addition, Mr. Durkee inexplicably looked only at whether DHEC had classified waters as impaired in 2004, a single year long after the violations found in this case. Durkee Decl., para. 5; *see* Sept. 2008 Bell Decl., para. 15.

Second, Mr. Durkee omitted relevant metals from his analysis. This Court found that Gaston violated its discharge limits for cadmium, copper, iron, and zinc and failed to monitor and/or properly report on its discharges of these metals as well as lead, mercury, and nickel. 2003 Findings and Conclusions, pp. 24-40; Pl. Trial Exs. 175, 176. However, Mr. Durkee considered only cadmium, copper, and zinc in his analysis. Durkee Decl., paras. 4-8, Exhibit C. He neglected to consider any data at all for iron,[5] lead, mercury, or nickel. Sept. 2008 Bell Decl., para. 10. Gaston is obviously wrong that Mr. Durkee's conclusions can stand "with respect to any pollutant discharged by Gaston Copper." Def. Br. 20.

Third, although use of the water downstream of the confluence is at issue, Mr. Durkee did not even review data from any stations downstream of the confluence. Sept. 2008 Bell Decl., para. 11. He reviewed data from only two stations – Station E-042, which is located on the Edisto River upstream of the confluence with Bull Swamp Creek, and Station E-104, which is located in Bull Swamp Creek. Durkee Decl., paras. 6-8, Exhibit C; *see* Sept. 2008 Bell Decl., para. 11. Neither of these stations provide information on the water quality downstream of the confluence. *Id*., para. 11.

Fourth, Mr. Durkee incorrectly interpreted the data he did review. Bell Decl., para. 12. Mr. Durkee states that only one sample was found to exceed the water quality standard. Durkee Decl., para. 6. Again, Mr. Durkee was able to reach this result only by failing to look at data in the correct time period, for all of the relevant metals, and from relevant locations. In addition, Dr. Bell explains that even in the data Mr. Durkee considered, there were more violations than were reported by Mr. Durkee. Sept. 2008 Bell Decl., para. 12. This is because Mr. Durkee incorrectly reported as "zero"

---

[5] Iron was removed from the South Carolina water quality standards as of June 27, 2008. Sept. 2008 Bell Decl., n. 17. This was after the plaintiffs' first brief in this remand was submitted and well after Gaston's discharge violations took place.

results that constituted violations and were not below the detection limit. *Ibid*. He also failed to explain that there may have been additional violations that occurred below the detection limit. *Id*., para. 13.

Dr. Bell concludes that "there is no doubt that Gaston Copper has contributed to * * * increased metals concentrations and water quality violations" on the Edisto River. Sept. 2008 Bell Decl., para. 14. In contrast to the selective analysis employed by Mr. Durkee, Dr. Bell has submitted, with his second declaration, data from 1992 to the present for all of the relevant metals, including data from monitoring stations downstream of the confluence.[6] *Id*., para. 14, Attachments A-F. These data show that the concentrations of the metals and the number and severity of water quality violations increase downstream of the confluence. *Id*., para. 14. Since there is no dispute that metals from Gaston's discharge travel to the locations where these violations occurred, Gaston has necessarily contributed to these violations. *Ibid*. As the Fourth Circuit has explained, "[r]ather than pinpointing the origins of particular molecules, a plaintiff 'must merely show that a defendant discharges a pollutant that causes or contributes to the kinds of injuries alleged' in the specific geographic area of concern" (citation omitted). *Gaston I*, 204 F.3d at 161; *see also Natural Resources Defense Council, Inc. v. Watkins*, 954 F.2d 974, 980 (4th Cir. 1992) ("To establish standing to redress an environmental injury, plaintiffs need not show that a particular defendant is the only cause of their injury, and that, therefore, absent the defendant's activities, the plaintiffs would enjoy undisturbed use of a resource.").

---

[6] Dr. Bell's data were submitted solely for purposes of rebutting Mr. Durkee's opinions. Plaintiffs' submission is not a concession that such data are relevant to plaintiffs' standing.

In sum, we emphasize that, as the Supreme Court held in *Laidlaw*, plaintiffs need not show a negative impact on the waterway receiving Gaston's discharges in order to establish standing. Moreover, even assuming *arguendo* that such a showing were required, Mr. Durkee's analysis, by omitting most of the relevant data, fails to demonstrate that Gaston's discharge has had no "effect" on water quality. Dr. Bell has shown that Gaston has undoubtedly contributed to water quality violations on the Edisto River. Therefore, Mr. Durkee's analysis should not be relied on.

## CONCLUSION

For the reasons given, plaintiffs' motion for summary judgment should be granted. A revised proposed order is attached.

Respectfully submitted,

/s/ Kathleen L. Millian

BRUCE J. TERRIS
KATHLEEN L. MILLIAN
JANICE GORIN
Terris, Pravlik & Millian, LLP
1121 12th Street, N.W.
Washington, DC 20005
(202) 682-2100
BTerris@tpmlaw.com
KMillian@tpmlaw.com
JGorin@tpmlaw.com

/s/ Robert Guild

ROBERT GUILD
ID # 2499
314 Pall Mall
Columbia, SC 29201
(803) 252-1419
BGuild@mindspring.com

October 2, 2008